[Crim. No. 5535. In Bank. Mar. 26, 1954.]

## THE PEOPLE, Respondent, v. WILBERT BERNARD BAKER, Appellant.

Henry E. Bianchi for Appellant.

Edmund G. Brown, Attorney General, and James D. Loebl, Deputy Attorney General, for Respondent.

TRAYNOR, J.—Defendant Wilbert Baker was charged by information with the murder of his wife, Clara Baker, on April 21, 1951. He entered pleas of not guilty and not guilty by reason of insanity. A doubt arose in the mind of the court as to the defendant's present sanity, and a trial on that issue was held on June 25, 1951, before a court sitting without a jury. Defendant was adjudged insane and was committed to the Mendocino State Mental Hospital under section 1370 of the Penal Code. On March 19, 1953, the superintendent of that hospital certified that defendant had recovered his sanity, and on March 27, 1953, he was returned to the sheriff to be held for trial. (Pen. Code, § 1372.) By stipulation, the issues raised by the pleas of not guilty and not guilty by reason of insanity were consolidated for trial. The jury returned verdicts that defendant was guilty of murder in the first degree, without recommending life imprisonment, and that he was sane at the time the offense was committed. Defendant's motion for a new trial was denied. His motion for a determination of his present sanity, pursuant to section 1368 of the Penal Code, was also denied, and he was sentenced to death. The appeal to this court is automatic. (Pen. Code, § 1239, subd. (b).)

Defendant was born and spent most of his life on an Arkansas farm. He had no formal schooling and cannot read or write. Tests performed at the Mendocino hospital, after the death of his wife, indicated that he is a moron with an intelligence quotient of about 70. Defendant's family moved to California in 1940, and ultimately settled in Bakersfield, where they lived at the time of the alleged offense. Defendant and his deceased wife had three children, Larry, Bob, and Merlene, who were 8, 10 and 12 years old respectively at the time of their mother's death. Defendant and his wife worked as agricultural laborers, when they were able to do so. His wife suffered from a back ailment for which she had undergone two operations, and defendant has a severe form of epilepsy that had prevented his working at a regular employment during the four or five years preceding his wife's death. His activities were confined to caring for the yard about their house, and his in-laws testified that he did a poor job of that. Defendant had his first epileptic seizure at the age of 15, and they have continued intermittently ever since. (Defendant was 44 years old at the time of the trial.) These seizures did not, however, interfere with his employment until 1944 or 1945, when they began to increase in frequency and severity. Defendant received occasional treatment at the Kern General Hospital for several years thereafter, and, on the advice of its doctors, he quit working. His condition became progressively worse until, in 1948, he was examined by Dr. Richard Loewenberg, Chief Visiting Psychiatrist at the Kern General Hospital, after having a particularly severe seizure. Dr. Loewenberg diagnosed him as an epileptic with clouded state and equivalents[1] and prescribed dilantin and phenobarbital, anticonvulsant medicines used to control epilepsy. Several days later defendant had another severe

---

[1]The clouded state is an equivalent or substitute for the epileptic convulsion. Dr. Loewenberg, in his testimony at the trial, defined the clouded state as follows: "Clouded state means a narrowing in of the state of consciousness in which from a superficial observation of the patient, he doesn't seem to have anything wrong with him at all. He can move about. He might be able to talk. He can do all kinds of itemized actions. That means like winding a watch, taking a cigarette. There are hundreds of minor movements and motions that everybody does even without thinking about. But there are certain lacks of inhibitions. They can get extremely aggressive and violent. . . . A clouded state can last from a very short period of time to many days, and once in a while into weeks." It was also stated, by both doctors who took part in the trial, that an epileptic would have no recollection of what occurred while he was in a clouded state, that he would not be mentally responsible for his actions during that time.

seizure and was again taken to the Kern General Hospital and, on the recommendation of Dr. Loewenberg, he was committed to Camarillo State Mental Hospital. There he was diagnosed as an epileptic with clouded state, convulsive seizures, and psychosis. He was later paroled from Camarillo to the care of his wife. The evidence indicates that on his return from that institution his condition was much better for several months, but the clouded state and seizures returned, gradually increasing in frequency and severity until he was again committed to Camarillo. Between the years 1948 and 1951, he was committed to Camarillo three different times. After each commitment, he was paroled to his wife, and he was still on parole at the time she was killed. During these years he remained in the care of Dr. Loewenberg and continued to take the medicines that he prescribed. After a little experimentation, the dosage was fixed at three-four capsules of dilantin (one and one-half grains each) and one phenobarbital tablet (one and one-half grains) per day.

Clara Baker was killed at approximately 1 a. m., April 21, 1951. During the day of April 20, 1951, defendant stayed at home taking care of six or seven of his wife's sister's children, while she worked in the potato sheds. Defendant was alone with the children in the early afternoon, when he had a seizure and fell out the back door. As he regained consciousness, he found one of the little girls rubbing his face with a wet cloth. He went into the house and lay on the divan in the living room. The child put a cold wet cloth on his forehead, as she had seen defendant's wife do. Clara Baker returned home at 4 in the afternoon, accompanied by several women from the neighborhood, who left shortly thereafter. Defendant's children returned from school at 4:30. His daughter, Merlene, noticed that her father looked sick. At defendant's request, his son Bob gave him some of his medicine. Bob made an error and gave defendant Clara's pills, and he took them by mistake. He also took his own pills, and there is evidence that he took an overdose of pills later in the evening. Defendant and his wife had planned to go to a show that night, but Clara told him that he didn't look well and that they shouldn't go. At her suggestion he lay on the divan for awhile. Defendant remembers nothing after that until he "awakened" in the Kern General Hospital three days later. Although defendant had no recollection of it, it was established that about 6 p. m. he called on his brother Robert, who lived two blocks away, to borrow money

for the show. Robert Baker testified that defendant was staggering when he was at his house and that, as defendant was leaving, he staggered into the door facing. He helped defendant out, and told him to go straight home. The evidence indicates that he did return home directly, and that he remained there the rest of the evening.

During the evening of April 20th defendant's children were listening to the radio. They testified that their parents were bickering over trivial matters, as they had often done in the past. Defendant was complaining because they had not gone to the show, and because he wanted the family car to make a trip to Arkansas. The testimony of the children indicated that the quarrel was neither serious nor heated, but they also testified that at one point defendant threatened to kill Clara. There was further testimony that defendant had so threatened Clara several times in the past, and that the threats always occurred when defendant's seizures were becoming so severe that Clara would suggest that he return to Camarillo. Clara never seemed frightened by his threats and often remarked, as she did on the night of April 20th, that he should ''go ahead and get it over with.'' The children went to bed and to sleep around 10 or 10:30. At that time, Clara was lying on the divan in the living room because its hardness would relieve her backache, and defendant was sitting on a chair in the kitchen with his feet propped up on another chair.

Sometime during the night, defendant's youngest child, Larry, was awakened by an unusual noise, ''kind of like a pig.'' He went into the living room where he found defendant standing by the divan on which his mother was lying. She did not move or speak, and the child saw blood running down her nose and onto the floor. Defendant told the boy to ''get back to bed before I knock hell out of you.'' From his bed Larry could see into the kitchen, and almost immediately he saw defendant go through the kitchen, in which a light was on, and out the back door. Defendant returned in half a minute, stayed in the kitchen for a short time, went out the back door again and did not return. Larry testified that he did not have anything in his hands when he saw him in the living room or when he passed through the kitchen to go out the back door. After defendant left the house the second time, Larry awakened his brother and sister. Merlene approached the divan to speak to her mother and got blood

on the robe she was wearing. The children decided to go to an uncle's house a few houses away, but before they left Merlene noticed that a small paring knife was missing from the kitchen. The children testified that as they left the house they found the front door locked from the inside by a wooden latch. On their way out Merlene, who was barefooted, stepped on a burning cigarette butt on the walk between their front porch and the street. None of the children recalled having heard their dog bark at any time that night. They went to their uncle's house, and the police were called.

The police arrived at the Baker house at approximately 1:20 a. m., April 21, 1951. They found Clara Baker lying on the divan in the living room. The autopsy surgeon testified that death had been caused by two violent blows on the head. The wounds had bled profusely, and there was much blood over her face and body and on the floor under the couch. The right side of her skull, behind and below the ear and at the base, was extensively fractured. The nature of the wounds indicated that the blows were struck by a weapon "that had both something of an edge and some weight." The autopsy surgeon thought that the weapon was probably an "ordinary hatchet" or an axe.

Defendant was arrested at his brother Robert's house two blocks away. After he had left his own house the second time, defendant had apparently proceeded down an alley that ran alongside the house, then through a field to an irrigation canal into which he fell or jumped. He climbed out of the canal and went to his brother's house. Robert testified that defendant was wet from head to foot and was in "pretty bad shape" when he arrived. He helped him into the house and onto a sofa. Defendant told Robert, "We have to get over to the house," and Robert thought he also mumbled something about chasing someone. When the officers arrived a short time later, defendant was unable to stand by himself. In the police car, defendant told the officers that he did not kill his wife, that the killer was a "great big man about four feet tall." The police did not take defendant to jail, but took him to the Kern General Hospital. They did so, they said, because there appeared to be something wrong with him and because he was irrational and incoherent.

The police searched the Baker house and the surrounding area. The canal was drained and the bottom raked for one-half block on either side of the point at which defendant went into it. The Bakers' outside toilet was moved and the

septic tank was pumped. The murder weapon was never found. The small paring knife that was missing from the Bakers' kitchen was found in the canal, but the prosecution admitted that it could not have been the murder weapon. Two of the officers followed defendant's tracks to the canal. They did so with the aid of one of defendant's shoes that had been taken from him at the time of his arrest. These two officers testified that defendant's tracks were the only fresh ones going down the alley and through the field, and that he appeared to be walking. On cross-examination, it was brought out that the alley was a hard-packed dirt path that was well-traveled, and that defendant's were not the only tracks in the field going toward the canal. One of the officers admitted that he could not say positively that defendant was not chasing someone down the alley, and the other officer, although contending that there were no other fresh tracks, admitted that he was "mainly interested" in those of the defendant when he searched the alley. Plaster casts were not made of defendant's or any other tracks. Defendant's clothes as well as a hatchet that was found in the Baker house were sent to the laboratory. There was testimony that the hatchet had no traces of blood, and that it did not appear to have been washed. In the People's closing argument, it was admitted that there were no blood stains on defendant's clothing. No effort was made to clean defendant's fingernails to determine if he had had blood on his hands since they were last cleaned. No evidence was introduced of any fingerprints taken in the Baker house.

At 2:35 on the afternoon of April 21st, Dr. Loewenberg interviewed defendant at the Kern General Hospital. He testified that defendant's tongue was coated, his left eyelid swollen, and his speech "glossy" and incoherent. Defendant told Dr. Loewenberg that he had taken too much medicine, that he didn't remember what had happened, that he couldn't see, that he didn't know where his wife was, that she was lying in the back bedroom and "[A] man with a black mask came in, I don't know what he was. Might be the guy who stole the orange trees. I'm not going crazy. I took four capsules today. Bring Dr. Loewenberg here. He is the guy who told me to take four capsules. . . . Where is my wife? She should be up here by now. They can't keep me here. I'm no criminal. I took too much of that medicine. . . . I want to know about my wife and kids. . . ." Dr. Loewenberg testified that defendant was definitely in a clouded state

at the time of this interview, and that his incoherence was not caused by an overdose of medicine. After this interview the doctor advised the police that they could talk with defendant that evening, but he warned that defendant was quite "drowsy and dazed."

A deputy sheriff and an investigator from the district attorney's office interviewed defendant that evening. The deputy sheriff, who testified about this interview, said that defendant didn't talk rationally, that he acted drunk, and appeared not to be well. He testified that defendant couldn't remember his age, but said that he could remember part of what had happened the preceding evening. Defendant said that he and Clara had been quarrelling, that each had taken a bath and Clara had lain on the divan in the living room while defendant went to bed in the back bedroom. He asked Clara to join him, but she refused. Defendant then went to sleep, and woke up hearing a noise in the living room. He got up to investigate, saw a man run out the front door, gave chase and wound up in the canal. After the interview, the deputy sheriff told defendant's parole officer from Camarillo that he was "personally satisfied that [defendant] was not mentally responsible at the time of the offense." The same officers also interviewed defendant on April 23d, after he had apparently regained consciousness. Defendant did not remember the previous interview. The deputy sheriff said that defendant still did not look well. He told defendant that Clara was dead, and asked him if he had killed her. Defendant replied, "I might have, but if I did I don't remember it." He said that he was unable to remember anything after 4:30 on Friday afternoon (April 20th) when his son had given him some medicine and Clara had persuaded him to lie down for awhile. Dr. Loewenberg also saw defendant on April 23d. He testified that defendant had torn his bed sheets into strips and tried to hide them. Although his speech was no longer glossy, he was unable to touch his finger to his nose in one motion. Defendant again complained about his eyes, saying that he had not been able to see for three weeks and that he had told his wife about it, but she had not believed him.

During his stay in the Kern General Hospital, defendant was observed having several convulsive seizures and periods of unconsciousness. On May 29, 1951, the court appointed three doctors to examine defendant to determine his sanity. All three doctors concluded that defendant had epilepsy with

clouded state, and that he was insane at the time of the offense and was then unable to determine the difference between right and wrong. All three recommended his commitment to a mental hospital for the criminally insane.

Considerable evidence was introduced of defendant's medical history. This history showed that he has had epileptic seizures and periods of unconsciousness since he was 15 years of age. During the five-year period preceding his trial, he was consistently diagnosed by a number of doctors, psychiatrists, and neurologists as an epileptic with clouded state and equivalents. Sometimes the word "psychosis" was added to the diagnosis. The doctors also agreed that a person with such a disease could be dangerous, but that he had probably been released from Camarillo because it was thought that, with regular dosages of anticonvulsant medicines, he would be relatively harmless. The limitations of the hospital's facilities and personnel were also a factor in this decision. Dr. Loewenberg, who had treated defendant more than any other doctor, said that in his opinion, on the basis of the defendant's history and his condition on the day following the crime, defendant was not mentally responsible at the time of Clara's death, that he was in a clouded state at that time. Defendant's children testified that he frequently had "spells" and, although he appeared to them to be all right on the evening before Clara's death, the doctors testified that his seizures and clouded states could come on very quickly, in the space of a few minutes. The records of the Mendocino hospital showed that defendant was diagnosed there as an epileptic with clouded state and equivalents, and with psychosis. These records also show that Dr. R. S. Rood, superintendent of that institution, agreed with this diagnosis and thought that defendant was in a clouded state at the time of the offense. In his testimony at the trial, however, Dr. Rood said that he doubted whether that diagnosis was correct. His doubts arose, he said, because neither the records of Mendocino nor those of Camarillo disclosed that defendant had been observed in an epileptic seizure. He testified, however, that there were so many inmates in the yards of these institutions and so few attendants that seizures could easily go unnoticed. Defendant testified that he could remember having several seizures in each institution. In addition, the records of the Kern General Hospital contain several entries showing that nurses and doctors had observed defendant in a seizure, and Dr. Loewenberg

had seen him in a clouded state on at least one occasion. Furthermore, as the defense pointed out, all during defendant's stay at both Camarillo and Mendocino he was given regular medication designed to reduce or prevent convulsive seizures. Dr. Rood also intimated that he thought defendant might not be an epileptic at all, but might have a heart disease known as paroxysmic tachycardia, or hysterical seizures, or he might be malingering. On cross-examination he admitted, however, that it was unlikely that a person with defendant's I.Q. could successfully malinger undiscovered for so long a period of time, and that it was unlikely that the 20 or more doctors who had diagnosed him were wrong. It should also be noted that Dr. Rood was not associated with the Mendocino hospital and did not see defendant until January, 1953, less than three months before defendant was returned to Kern County to stand trial. So far as the record shows, Dr. Rood's connection with defendant after January, 1953, was limited to participation in one staff conference in February and another in March, 1953.

There was also considerable evidence about the nature of the drugs defendant took by prescription. The experts were agreed that both dilantin and phenobarbital were hypnotic drugs and, if taken in overdose, could be dangerous since they would remove the inhibitions of the person taking them. There was testimony that these drugs had an intoxicating effect similar to that of alcohol, and that defendant often acted drunk after taking his pills. There was also testimony that an overdose of these drugs could accelerate or aggravate the clouded state condition of an epileptic because persons in a clouded state lack normal inhibitions and sometimes become extremely aggressive and violent.

Defendant contends that the evidence is insufficient to sustain his conviction of first degree murder, that it was not shown that he committed the crime, and that, even if it could be inferred that he did, it was not shown that the murder was deliberate and premeditated.

Defendant points out that no blood was found on his person or on his clothes, that the murder weapon was never found, although an extensive search was conducted, and that the presence of the kitchen knife in the canal and the qualified character of the police officer's testimony about the tracks in the alley and the field, all tend to corroborate his statement that he chased an intruder and fell into the canal.

■ Although the evidence is weak and there are many unexplained and apparently uninvestigated items of evidence pointing away from defendant's guilt, the record supports the conclusion that defendant did in fact strike the fatal blows. It is undisputed that he was in the house at the time of his wife's death and that his statements as well as his son's placed him in the front room with his wife shortly after the blows were struck. Except for defendant's statements, made at a time when the defense claims he was in a clouded state, there is no evidence that anyone else except the children was in or about the Baker house at the time of the offense. Shortly after the crime, defendant told police officers that he had chased an intruder out the front door. The children testified that the front door was locked from the inside. They also testified that they did not hear their dog barking at any time during the night. In support of his contention that it was not proved that he did strike the blows, defendant points to Merlene's testimony about stepping on a lighted cigarette in the path leading from their front porch to the street. Defendant testified that he had run out of cigarettes in the afternoon and had not smoked that evening. One of the children testified, however, that defendant was sitting by the kitchen stove smoking sometime after dinner. The jury could reasonably have concluded that defendant ran around the house and intentionally or accidentally dropped the cigarette when he ran out the first time after his son Larry was awakened. ■ It was for the jury to resolve conflicts in the evidence and to determine the inferences to be drawn therefrom. (*People* v. *Daugherty*, 40 Cal.2d 876, 884-885 [256 P.2d 911]; *People* v. *Green*, 13 Cal.2d 37, 42 [87 P.2d 821]; *People* v. *Perkins*, 8 Cal.2d 502, 510 [66 P.2d 631]; *People* v. *Watts*, 198 Cal. 776, 789 [247 P. 884]; *People* v. *Tom Woo*, 181 Cal. 315, 326 [184 P. 389].)

■ Defendant contends that the evidence is insufficient to support the verdict that he was sane at the time the offense was alleged to have been committed. The positive evidence was overwhelming that defendant was not sane, but the People contend that the "personal appearance, mannerisms and actions of the defendant before the jurors during the trial, and the character of his testimony and manner of giving it, were matters properly considered by" the jury (*People* v. *Chamberlain*, 7 Cal.2d 257, 260-261 [60 P.2d 299]) and were sufficient to support the verdict of sanity. This conten-

tion cannot be sustained. Defendant was not brought to trial for more than two years after the death of his wife. During that period he was confined in a mental hospital and was not brought to trial until the superintendent of the mental hospital certified that he had recovered his sanity so as to be able to assist counsel in the conduct of his trial. There was no showing whatever that defendant's mental condition was the same at the time of his trial as it was immediately after the death of his wife. Under these circumstances the jury could not reasonably infer from defendant's conduct at the trial that he was sane at the time of the offense.

The People also rely on the rebuttable presumption of sanity. ■ On the trial of the issue raised by the plea of not guilty by reason of insanity, there is a rebuttable presumption that defendant was sane at the time the crime was committed (*People* v. *Myers,* 20 Cal. 518; *People* v. *Loper,* 159 Cal. 6, 11 [112 P. 720, Ann.Cas. 1912B 1193]; *People* v. *Williams,* 184 Cal. 590, 593 [194 P. 1019]; *People* v. *Hickman,* 204 Cal. 470, 477 [268 P. 909, 270 P. 1117]; *People* v. *Leong Fook,* 206 Cal. 64, 67, 70 [273 P. 779]; *People* v. *Chamberlain,* 7 Cal.2d 257, 260 [60 P.2d 299]) and defendant has the burden of proving his insanity by a preponderance of the evidence (*People* v. *Daugherty,* 40 Cal.2d 876, 901 [256 P.2d 911]). ■ Proof that defendant was afflicted with a permanent insanity, as distinguished from a temporary or transient insanity, prior to the commission of the crime charged will, however, dispel the presumption of sanity and raise a presumption that his insanity continued to exist until the time of the commission of the crime. (*People* v. *Farrell,* 31 Cal. 576, 581; *People* v. *Francis,* 38 Cal. 183, 188-191; *People* v. *Lane,* 101 Cal. 513, 518-519 [36 P. 16]; *People* v. *Schmitt,* 106 Cal. 48, 53 [39 P. 204]; *People* v. *Findley,* 132 Cal. 301, 307 [64 P. 472]; *People* v. *Keyes,* 178 Cal. 794, 800-801 [175 P. 6]; *State of Oregon* v. *Garver,* 190 Ore. 291, 299-309 [225 P.2d 771] and authorities cited; see 8 Cal.Jur., § 143; 27 A.L.R.2d 121; 1 Wharton's Criminal Evidence, § 212 [11th ed., 1935].) ■ In the present case, there was ample evidence to establish defendant's insanity prior to the killing of his wife. He had repeatedly been diagnosed as an epileptic with clouded state and psychosis; he had been adjudicated an insane person and thrice committed to the Camarillo State Mental Hospital, and he was on parole from that hospital at the time of the crime. He was similarly adjudged insane shortly after the crime was committed.

Although we cannot say as a matter of law that the evidence discharged defendant's burden of proving that he was insane at the time of the offense, the jury should have been instructed that proof of a permanent insanity prior to the commission of the crime raised a presumption that such insanity continued to exist until the time of the offense.

Defendant also contends that the joint trial of his pleas of not guilty and not guilty by reason of insanity so confused the issues that defendant's right to a fair and impartial trial was prejudiced. Defendant's counsel, however, stipulated that the two pleas could be tried together. Although defendant cannot complain of the joinder as such (see *People* v. *Hazelwood,* 24 Cal.App.2d 690, 692 [76 P.2d 151] ; *People* v. *Pettinger,* 94 Cal.App. 297, 300-301 [271 P. 132] ; see also *People* v. *Dessauer,* 38 Cal.2d 547, 554 [241 P.2d 238]), he did not by his stipulation waive any errors that might have been committed, as a result of the joinder, by the court in instructing the jury.

The court instructed the jury in part as follows: "A presumption is a deduction which the law expressly directs to be made from particular facts. Unless declared by law to be conclusive, it may be controverted by other evidence. . . .

. . . . . . . . . . . .

"Upon the trial of the issue raised by the plea of not guilty, the defendant is conclusively presumed to have been sane at the time the offense is alleged to have been committed. . . .

. . . . . . . . . . . .

"A person must be presumed to intend to do that which he voluntarily and wilfully does in fact do, and must also be presumed to intend the natural, probable and usual consequences of his own acts. Therefore when one person assails another voluntarily with a dangerous weapon likely to kill, and which does in fact destroy the life of the person assailed, the presumption is that such assailant intended death or other great bodily harm.

"Any such presumption as I have mentioned, however, may be overcome by contrary evidence; and any such evidence is sufficient to overcome it which creates in the minds of the jurors a reasonable doubt that the defendant's intent was as so presumed. In the absence of evidence to the contrary, the presumption must prevail.

. . . . . . . . . . . .

"There has been testimony concerning the mental state

of the defendant at the time of the offense charged against him in the information, and you will be instructed as to the law concerning the test of insanity as a defense to a criminal charge. Before you determine whether or not the defendant was legally sane or insane at the time of the offense alleged against him in the information, however, it will be necessary that you first determine his guilt or innocence.

"In determining the guilt or innocence of the defendant, you are to be governed by the conclusive presumption that the defendant was sane at the time the offense was alleged to have been committed. A conclusive presumption, as a matter of law, is not rebuttable. Therefore the conclusive presumption that the defendant was sane and of sound mind at the time of the commission of the crime charged in the information is not rebuttable, and if you are convinced from the evidence beyond a reasonable doubt that the defendant did unlawfully kill his wife, . . . then you must find the defendant guilty, even though you, as jurors, may have some doubt as to the present soundness of mind of the defendant, or some doubt of the soundness of mind of the defendant at the time of the commission of the crime, as charged in the information. This means that he is presumed to have the legal capacity to commit the act so far as sanity is concerned but it does not preclude you from finding that the mental state of the defendant was such that he did not have the intent necessary to constitute the crime.

"The defendant has entered a plea of not guilty to the crime charged in the information and has also entered a plea of not guilty by reason of insanity, thereby alleging that he was insane at the time of the commission of the offense charged in the information. After the issue raised by the plea of not guilty is determined it will be necessary for you to determine the issue raised by the plea of not guilty by reason of insanity if you should find defendant guilty of the crime charged in the information, because the law does not hold a person criminally accountable for his conduct if at the time thereof he was insane.

"The sole issue for you to determine in regard to the insanity plea is whether or not the defendant was sane or insane at the time of the commission of said offense. You must determine the condition of his mind at the precise time of the criminal conduct if he is found guilty of such crime . . .

"The burden of proving insanity is on the defendant . . .

"The law presumes that the defendant was sane. That presumption may be rebutted but is controlling until overcome by a preponderance of the evidence as, when weighed with that opposed to it, has more convincing force, and from which it results that the greater probability of truth lies therein.

. . . . . . . . . . . .

"You are reminded, however, that a person might be legally sane, as we define the term in dealing with the question of criminal responsibility, and yet be in an abnormal mental or nervous condition; and because of such condition he might be less likely or unable to have or to hold a specific intent or a certain state of mind, which is an essential ingredient of a certain crime. We have received evidence bearing on the mental and nervous condition of the defendant at the time of the alleged commission of the crime charged. Such evidence may be considered by you in determining whether or not the defendant did any overt act charged against him, and, if so, whether or not, at that time, there existed in him the specific mental factor which, as you have been instructed, must accompany that act to constitute a certain crime or degree of crime."

■ These instructions are confused, contradictory, and ambiguous. They did not inform the jury in clear and unmistakable terms of the principles that must guide their deliberations; in particular, they did not inform the jury what part of the evidence bearing on defendant's mental condition was applicable to the several issues submitted to them. The jury was first instructed that only conclusive presumptions are not rebuttable. It was then declared that on the issue raised by the plea of not guilty, defendant is conclusively presumed to have been sane at the time the offense was committed. Next, several presumptions are mentioned relating to the general proposition that all persons are presumed to intend the usual and probable consequences of their acts. The court then stated, "*Any* such presumption as I have mentioned, however, may be overcome by contrary evidence . . ." (Italics added.) The court had just mentioned the conclusive presumption of sanity, and the quoted statement is in direct contradiction to the earlier statement that conclusive presumptions are not rebuttable. The remainder of the statement just quoted—"any [contrary] evidence is sufficient to overcome [the presumptions that have

been mentioned,] which creates in the minds of the jurors a reasonable doubt that the defendant's intent was as so presumed"—may indicate that the court meant only that the presumptions that men intend the usual and probable consequences of their acts could be overcome by contrary evidence. The statement is susceptible of this construction, but the apparent contradiction involved must be weighed with the other elements of confusion and ambiguity that are discussed below.

Immediately after the instructions just discussed, the jury was again instructed that on the issues raised by the plea of not guilty, defendant is conclusively presumed "*sane and of sound mind* at the time of the ·commission of the crime charged. . . . [I]f you are convinced beyond a reasonable doubt that the defendant did unlawfully kill his wife, . . . then you must find the defendant guilty, even though you, as jurors, may have some doubt as to the present *soundness of mind* of the defendant, or some doubt of the *soundness of mind* of the defendant at the time of the commission of the crime, as charged in the information. This means that he is presumed to have had the capacity to commit the act so far as *sanity* is concerned but it does not preclude you from finding that the mental state of the defendant was such that he did not have the intent necessary to constitute the crime." (Italics added.) By the use of the word "intent" in the last phrase and in other instructions, it is clear that the court meant the intent involved in the elements of malice aforethought, premeditation, and deliberation. It is also clear from the context that the court used the phrase "sound mind" as the equivalent of legal sanity, for it was said that on the trial of the issue of not guilty a person is conclusively presumed to be of "sound mind." ■■ "Sound mind" and "legal sanity" are not synonymous. Indeed, in the instructions explaining legal sanity to the jury in this case the phrase "sound mind" was not used. As has been long established, a person is legally sane if he knows the nature and quality of his acts, and their wrongfulness, if any. (*People v. Kimball*, 5 Cal.2d 608, 610 [55 P.2d 483] ; *People v. Keaton*, 211 Cal. 722, 724 [296 P. 609].) "Soundness" of mind is defined as "free from flaw, defect or decay, perfect of the kind; undamaged or unimpaired; healthy, not diseased or injured, robust—said of body or mind." (Webster's New Internat. Dict., p. 2403.) ■■ The distinction that these definitions draw between soundness of mind and legal sanity is

impliedly recognized in section 26 of the Penal Code, which provides that lunatics, idiots, and insane persons are not capable of committing crimes. It is expressly provided in section 21 of the Penal Code that idiots and lunatics are not of sound mind; yet, if soundness of mind and legal sanity are synonymous, the express provisions of section 26 exempting idiots and lunatics from criminal responsibility would be superfluous because they would necessarily be included within the provision exempting the insane.

 The prejudicial nature of the instruction appears most clearly in the difficulties that it creates for the jury in the application of the rule stated in *People* v. *Wells,* 33 Cal.2d 330, 346-358 [202 P.2d 53], that evidence of a mental infirmity, not amounting to legal insanity, is admissible and should be considered by the jury on the questions of premeditation and deliberation. If the defendant has a "sound mind," that is, "a healthy and robust mind, neither diseased nor injured," it necessarily follows that he would not have a mental infirmity making him incapable of premeditating or deliberating. If an idiot or a lunatic were charged with a crime, an instruction that he was conclusively presumed to be of "sound mind" would create an obvious conflict with his statutory defense. Although moronity and the mental condition caused by epileptic seizures, unless they amount to unconsciousness, are not included within the exempting provisions of section 26 of the Penal Code, nevertheless these conditions may indicate some lack of a "healthy and robust mind" and do have bearing on the question of the capacity to premeditate and deliberate. In the present case, evidence introduced by the People as well as by defendant shows that defendant is a moron and has been, for many years, subject to epileptic attacks affecting his mental faculties in varying degrees and for varying lengths of time. At the trial, defendant testified that he did not remember anything that happened the night his wife was killed. One of his defenses was that if he killed his wife, which he did not remember doing, he did it while under the influence of an epileptic attack. Defendant claims that this condition amounted to legal insanity or, alternatively, that it negatived any element of premeditation or deliberation. The only evidence pointing to premeditation and deliberation is the testimony of the Baker children that defendant threatened his wife earlier in the evening. There was also testimony that defendant had threatened his wife's life several times during a three- or

four-year period preceding the offense. But each of the several persons who testified about such threats qualified their testimony by saying that the threats were made just before defendant had an epileptic seizure or when defendant's epileptic condition had become so aggravated that his return to the Camarillo hospital was imminent. There is no evidence that during the intervals when defendant was free from the clouding effects of his disease, he had any animosity toward his wife or that he had ever harmed her. Further, the evidence is uncontradicted that defendant, when not suffering an attack of epilepsy, had a friendly, sunny, and harmless disposition, and there is no evidence that the Baker family life was anything but harmonious during the intervals defendant was free from the effects of his disease. In addition, there is the fact that when the Baker children went to bed on the night of the crime, the Baker household was peaceful. Clara was resting on the divan in the living room, and defendant was sitting propped up on two chairs in the kitchen. Their bickering about attending a show and about defendant's proposed trip to Arkansas had stopped.

Defendant's conduct after the killing also points away from premeditation. He did not attempt as did the defendant in *People* v. *Eggers*, 30 Cal.2d 676 [185 P.2d 1], to hide the body or to mutilate it to prevent identification. Defendant claimed that he chased an intruder down the alley, and there is evidence of hallucinations in his medical history. Furthermore, defendant did not attempt to hide himself. Instead, he went almost immediately to his brother's house, where his only intelligible words were, ''We have got to get over to the house.'' His brother, as well as the police officers who arrested him, testified that defendant was irrational and incoherent at this time. The police officers took him to the hospital rather than to jail. Dr. Loewenberg, who visited defendant at the hospital some 13 hours after the crime, testified that defendant was then in a clouded state, and that, in his opinion, he was in a clouded state at the time of the killing. It was thus a very close question of fact whether or not the People had proved beyond a reasonable doubt that the killing was ''willful, deliberate, and premeditated.'' It was, therefore, vital that the jury be properly instructed in clear and unambiguous terms. It was error for the court to instruct the jury that on the trial of the issue of not guilty, defendant was conclusively presumed to be of ''sound mind.'' The effect of such an instruc-

tion was to tell the jury that it could not consider defendant's moronity and the effect on his mental faculties of many years' suffering from epilepsy in determining his defense based on lack of capacity to premeditate and deliberate.

Furthermore, this instruction creates an irreconcilable conflict with the subsequent instruction that the jury could consider defendant's mental state in determining whether he had the "intent" necessary to constitute malice aforethought, premeditation, or deliberation. The instruction also creates an irreconcilable conflict with the last paragraph of the court's instruction on defendant's plea of not guilty by reason of insanity. After the jury was instructed on the issues raised by this plea, that defendant has the burden of proving his insanity by a preponderance of the evidence (*People* v. *Daugherty,* 40 Cal.2d 876, 901 [256 P.2d 911]), and that there is a rebuttable presumption that defendant was legally sane at the time of the commission of the offense (*People* v. *Chamberlain,* 7 Cal.2d 257, 260 [60 P.2d 299]), the jury was then "reminded, however, that a person might be legally sane . . . and yet be in an abnormal mental or nervous condition; and because of such condition might be less likely or unable to have or to hold a specific intent or a certain state of mind, which is an essential ingredient of a certain crime. . . . [Evidence bearing on defendant's mental or nervous condition] may be considered by you in determining whether or not the defendant did any overt act charged against him and, if so, whether or not, at that time, there existed in him the specific mental factor which, as you have been instructed must accompany that act to constitute a certain crime or degree of crime." There is thus an "irreconcilable conflict in the instructions, and we are not at liberty to speculate as to which of them the jury followed. [Citations.]" (*People* v. *Deloney,* 41 Cal.2d 832, 829 [264 P.2d 532].)

Defendant also complains of another instruction relating to the issue of premeditation and deliberation. He contends that the trial court erred in failing correctly to instruct the jury on the effect of his intoxication on the question of the intent with which he committed the acts charged. The jury was given an instruction[2] based on the

[2]"Our law provides that 'no act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such a condition.' This rule applies to intoxication from any cause when voluntarily produced by the person later charged with the

first sentence of section 22 of the Penal Code: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition." Defendant contends the court erred in not giving an instruction[3] based on the second sentence of section 22: "But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury must take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act." This sentence has been interpreted to include intoxication by drugs as well as by intoxicating liquors. (*People* v. *Sameniego,* 118 Cal.App. 165, 173 [4 P.2d 809, 5 P.2d 653]; *People* v. *Lim Dum Dong,* 26 Cal. App.2d 135, 140 [78 P.2d 1026].) In *People* v. *Coyne,* 92 Cal.App.2d 413 [206 P.2d 1099], the trial court had instructed the jury in the language of the first sentence of section 22 only. In reversing the judgment of conviction of first degree murder, the District Court of Appeal said: " '[I]n determining whether or not the killing was so willful, deliberate, and premeditated as to constitute murder in the first degree, it is proper for the jury to consider how much his mental condition at the time was affected by intoxication, and, there being an express statutory declaration upon the subject of intoxication, a defendant in a murder case is entitled to have an instruction embracing such statutory declaration given

---

crime; and it means that such intoxication, if shown by the evidence to have existed in the defendant when he allegedly committed the crime charged, is not of itself a defense in this case. It may throw light on the occurrence and aid you in determining what took place, but when a person in a state of intoxication, voluntarily produced by himself, commits a crime such as that charged against the defendant in this case, the law does not permit him to use his own vice as a shelter against the normal, legal consequences of his conduct." (CALJIC No. 78-A.)

[3]Such as CALJIC No. 78-B: "However, when the existence of any particular motive, purpose or intent is a necessary element to constitute a particular kind or degree of crime, the jury, in determining whether or not such motive, purpose or intent existed in the mind of the accused, must take into consideration the evidence offered to prove that the accused was intoxicated at the time when the crime allegedly was committed.

"Thus in the crime of murder in the first degree, it is a necessary element of the crime that the killing be willful, deliberate and premeditated. This fact requires an inquiry into the state of mind under which the defendant committed the act charged, if he did commit it. In pursuing that inquiry, it is proper to consider whether he was intoxicated at the time of the alleged offense. The weight to be given the evidence on that question and the significance to attach to it in relation to all the other evidence are exclusively within your province."

by the court to the jury where there is evidence which makes it applicable; and, for the refusal of the court to give the instruction under discussion the judgment must be reversed and a new trial ordered.' . . . The fact that an instruction on intoxication (though inadequate) was given, indicates that the trial judge had satisfied himself that the evidence was . . . sufficient to put the question 'within the province of the jury.' His judgment on this question would seem to settle all doubts on the matter. . . . The failure to give the instruction in the language of section 22 was unquestionably prejudicial error.'' (92 Cal.App.2d at 416-417, quoting *People* v. *Hill,* 123 Cal. 47, 52 [55 P. 692]; see also *People* v. *Vincent,* 95 Cal. 425, 428 [30 P. 581]; *People* v. *Griggs,* 17 Cal.2d 621, 625 [110 P.2d 1031]; *People* v. *Blake,* 65 Cal. 275, 278 [4 P. 1]; *People* v. *Sanchez,* 35 Cal.2d 522, 527-529 [219 P.2d 9].) In this case there was ample evidence of intoxication in the record to raise a question of fact for the jury. There was evidence that defendant had voluntarily taken an overdose of both dilantin and phenobarbital on the night of the killing. Both of these drugs were described as hypnotics, as having the effect of removing the inhibitions of the person taking them, and as having an intoxicating effect similar to that of alcohol. There was testimony that when defendant had taken dosages of these drugs he acted groggy, like a ''drinking man.''

The factual issue was thus raised, and the court's failure to instruct the jury that it could consider defendant's intoxication by drugs in determining whether or not defendant committed the offense with premeditation and deliberation was highly prejudicial. Indeed, the prejudicial effect of the failure to instruct was enhanced by the inadequate instruction given—that defendant's acts were no less criminal by reason of the fact that he was intoxicated at the time he committed them. The giving of such an instruction without adding that defendant's intoxication could, however, be considered in determining the degree of the offense committed, had the same effect as if the jury were told that defendant's drugged condition could not influence their decision on any issue submitted to them. Defendant's defense on the theory of intoxication—the difference between first and second degree murder —was thus completely negatived by the instructions of the court.

The People contend, however, that the error was

overcome by other instructions given by the court. The first of these[4] was a part of the instructions on insanity, which informed the jury that even if they found defendant sane, such a finding would not preclude them from finding that his mental or nervous condition was such that he was incapable of deliberation or premeditation. This instruction did not inform the jury of the weight to be given to defendant's intoxication. Instead, it was responsive to defendant's defense that he was incapable of premeditation because of his moronity, his psychological disorders, and the mental deterioration caused by his epilepsy. The defense based on intoxication raised an entirely separate issue and should have been covered by a separate instruction. (*Cf. People* v. *Sanchez,* 35 Cal.2d 522, 528 [219 P.2d 9].) The other two instructions, which the People claim overcome the error in failing to instruct on intoxication, informed the jury that there is a rebuttable presumption of consciousness,[5] that an act committed by a person in a state of unconsciousness is not a crime, and that the "*in*voluntary intoxication produced by drugs or spiritous liquors" is an example of the unconsciousness that negates criminal responsibility.[6] (Italics

---

[4] "'You are reminded, however, that a person might be legally sane, as we define that term in dealing with the question of criminal responsibility, and yet be in an abnormal mental or nervous condition; and because of such condition he might be less likely or unable to have or to hold a specific intent or a certain state of mind, which is an essential ingredient of a certain crime. We have received evidence bearing on the mental and nervous condition of the defendant at the time of the alleged commission of the crime charged. Such evidence may be considered by you in determining whether or not defendant did any overt act charged against him and, if so, whether or not, at that time, there existed in him the specific mental factor which, as you have been instructed, must accompany that act to constitute a certain crime or degree of crime.'"

[5] "'When the evidence shows that a defendant acted as if he was conscious, the law presumes that he then was conscious. This presumption is disputable, but is controlling on the question of consciousness until overcome by a preponderance of the evidence . . . The rule of law just announced does not change, or make an exception to, the law which places upon the people the burden of proving defendant's guilt beyond a reasonable doubt.'" This instruction was specifically disapproved by this court in *People* v. *Hardy,* 33 Cal.2d 52, 63-64 [198 P.2d 865]. In the present case, however, the instruction was requested by defendant and the error was therefore, invited.

[6] "'When a person commits an act without being conscious thereof, he does not thereby commit a crime even though such an act would constitute a crime if committed by a person when conscious.

"'The condition of unconsciousness to which this instruction refers is by law distinguished and clarified from insanity, which is also in issue here, but is to be decided by you separately.

"'The state of unconsciousness to which I refer in this present instruc-

added.) Unconsciousness is a complete, not a partial, defense to a criminal charge (Pen. Code, § 26, subd. 5), and, although voluntary intoxication may at times amount to unconsciousness, yet it can only have the effect of negating specific intent, the applicable code section being section 22 and not 26, subdivision 5. (*People* v. *Anderson,* 87 Cal.App.2d 857, 860-861 [197 P.2d 839] ; *People* v. *Sameniego, supra,* 118 Cal.App. 165, 173.) In this case there was ample evidence of voluntary intoxication, and there was also evidence that defendant was unconscious at the time of the offense because he was in the ''clouded state'' of an epileptic attack. The evidence of unconsciousness being present, the instruction based on Penal Code, section 26, subdivision 5, was properly given, for defendant's complete defense based on unconsciousness was entirely separate from his partial defense based on intoxication.

 It is contended, however, that defendant was not voluntarily intoxicated ''because he took his pills and capsules to ward off an attack of epilepsy, and because he took his wife's pills by mistake,'' and that, therefore, his defense was adequately covered by the instruction on the effect of unconsciousness. This contention cannot be sustained. There was no evidence of the nature of his wife's pills and thus nothing from which the jury could infer that those pills had created an intoxicated or unconscious condition. The fact that defendant took his own pills, which are conceded to have an intoxicating effect, to ward off an attack of epilepsy may or may not mean that defendant was involuntarily rather than voluntarily intoxicated. It is conceded that defendant took the pills knowingly, but whether or not the imminent approach of an epileptic attack was sufficient to render his taking compulsive and thus involuntary was a question for the jury. Moreover, the fact that the court did give an inadequate instruction on voluntary intoxication was enough to create a doubt in the minds of the jurors. Although we might hesitate before holding that the absence of any instruction on voluntary intoxication in a situation such as that presented in this case is prejudicial error, when a partial

tion is a condition experienced by a person normally sane, wherein there is no functioning of the conscious mind . . . I shall cite a few examples of this type of unconsciousness to which this instruction refers: somnambulism . . . ; the delirium caused by fever, involuntary intoxication caused by drugs or spiritous liquors; and restricted consciousness caused by epilepsy.''

instruction has been given we cannot but hold that the failure to give complete instructions was prejudicial error. The facts and the partial instruction given might well lead the jury to believe that defendant's intoxication was not involuntary, but the effect of the instructions given was that the jury could consider defendant's intoxication only if they found that it was caused involuntarily and, further, found that it produced unconsciousness. If the jury found that defendant was voluntarily intoxicated, the instructions told them to disregard that condition in arriving at their verdict. That such instructions were in error is beyond question, and that they were highly prejudicial cannot be doubted.

It is finally contended that the trial court had no duty, on its own motion, to give an instruction based on the second sentence of section 22 of the Penal Code. Defendant admits that he did not request such an instruction, but argues that the trial court was obligated correctly to instruct the jury on all the factual issues raised by the evidence presented. As has been repeatedly held, ''It is incumbent upon a court in a criminal case to instruct the jury of its own motion, charging them fully and fairly upon the law relating to the facts of the case. [Citations.] The court is not relieved of the duty to give instructions whose necessity is 'developed through the evidence introduced at the trial.' [Citation.] An instruction is necessary if it is vital to a proper consideration of the evidence by the jury. [Citations.] . . . The circumstances of the case determine whether the failure to instruct the jury constitutes prejudicial error.'' (*People* v. *Putnam*, 20 Cal.2d 885, 890, 892 [129 P.2d 367] ; see, also, *People* v. *Warren*, 16 Cal.2d 103, 117 [104 P.2d 1024] ; *People* v. *Holt*, 25 Cal.2d 59, 64 [153 P.2d 21] ; *People* v. *Bender*, 27 Cal.2d 164, 176 [163 P.2d 8].) A proper consideration of the issues developed through the presentation of the evidence at the trial of this case required that the jury be instructed on the possible effect of voluntary intoxication on the state of mind with which defendant did the acts charged. (*People* v. *Sanchez*, 35 Cal.2d 522, 527-529 [219 P.2d 9].) Moreover, this is not a case where there was a complete failure to instruct, but a case where partial instructions were given and, as given, were erroneous. The instructions given directed the jury's attention away from the vital issue raised by defendant's contention that he was not voluntarily intoxicated. Their verdict was, therefore, ''uninstructed as to the law relating to the facts of [the] case [and] cannot

be sustained merely because proper instructions were not requested.'' (*People* v. *Bender, supra,* 27 Cal.2d 164, 176.)

▮ Since the facts revealed by the evidence, entirely circumstantial in nature, show the case to be a very close one on the questions of guilt, sanity, and premeditation, we must conclude that the numerous errors reviewed herein substantially and prejudicially affected the rights of defendant. Accordingly, a reversal is necessary to prevent a miscarriage of justice.

The judgment and the order denying defendant's motion for a new trial are reversed.

Gibson, C. J., Carter, J., and Schauer J., concurred.

Spence, J., concurred in the judgment.