S CHATTER, J.
A jury found defendant guilty of first degree murder of Lawrence Rice (count 1), first degree murder of John Berg (count 2), assault with a deadly weapon upon Dennis Butler (count 3), and assault by means of force likely to produce great bodily injury upon Dennis Butler (count 4). They fixed the penalty on each murder count at death and found that defendant was sane at the time of every offense. On this appeal from the ensuing judgment and an order denying a new trial, defendant attacks the M’Naughton rule by which California measures the insanity which renders *39 a person incapable of crime[1] and urges this court “to re-examine the existing test in California for determining criminal responsibility and to update its thinking and rulings on said subject.” We are not convinced that it is necessary or proper for us to undertake this task.
At the trial on the pleas of not guilty defendant introduced no evidence. The prosecution evidence, which includes extrajudicial declarations of defendant, is as follows:
Defendant, 33 years old and of no particular occupation or fixed abode, met Butler (victim of counts 3 and 4, the felonious assaults) for the first time on Los Angeles’ “skid row” on November 16, 1956. At defendant’s suggestion they visited bars and drank beer, for which defendant paid. According to Butler, in one of the bars defendant handed Butler $5.00 as a loan offered by defendant when he learned that Butler was without funds; according to defendant, he produced the $5.00 when Butler agreed to defendant’s request that they indulge in a homosexual relationship. They walked to defendant’s hotel room and there drank whiskey. According to Butler, he then for the first time realized that defendant was interested in a homosexual relationship; according to defendant, Butler refused to perform his agreement. Butler ran from the room. Defendant chased him for two or three blocks and demanded and received the $5.00. When Butler refused to return to the hotel room defendant stabbed him once in the abdomen with a hunting knife. Defendant assisted Butler to the lobby of defendant’s hotel. Butler testified that “It was just getting dark” and, in explanation of his failure to call for help when he was attacked on the street, that it “seems there was nobody around or nobody that would have done any good at all until I got in the lobby. ’ ’ There Butler shouted for help. While the hotel clerk was calling the police defendant knocked Butler to the floor and kicked him twice, breaking his collarbone. Defendant fled from the hotel and did not return.
Much of the hereinafter recounted detail as to defendant’s conduct is taken from recordings of his extrajudicial statements. For 10 days after the assaults on Butler, defendant *40 wandered about Los Angeles and nearby cities. On November 26, 1956, on a street in Long Beach, defendant for the first time met John Berg (victim of count 2, murder). Defendant was annoyed by Berg’s homosexual approach, but went with Berg to his apartment in order to obtain a place to sleep. During the night Berg “kept pestering” defendant with homosexual attentions. In the morning defendant was awakened by Berg “still fooling around” and stabbed him once in the abdomen and six times in the throat with a knife which defendant described as “Hunting knife. Ninety-eight cents. Favorite knife. Very cheap and very good. ... I’ve gone through about three of them knives.” Defendant washed, searched the apartment for money without success, dressed in a suit of Berg, and departed.
Defendant went to San Diego, then returned to the Los Angeles area. On November 29, 1956, defendant saw 10-year-old Lawrence Rice (victim of count 1, murder) playing on the Ocean Park beach. Defendant bought the boy soft drinks and hamburgers and walked with him along the beach and under the Santa Monica pier. There defendant stabbed the boy several times in the abdomen and about 18 times in the back. Some of the wounds were inflicted before and some after defendant pulled down the child’s trousers and underclothes and pulled up his shirt. Defendant slashed the boy’s left buttock and departed. He took a bus to Los Angeles and returned to “skid row.” There, on the afternoon of November 29, 1956, he came to the attention of the police because he happened to be present when they made an arrest unconnected with defendant. When defendant so came to their attention, the officers detained him, cheeked their records, and found that there was a warrant for his arrest for the Butler assaults.
On the trial of the general issue three court-appointed physicians who were experienced in psychiatry and who had examined defendant (Dr. Marcus Crahan, Dr. Karl Von Hagen, Dr. Robert Wyers) testified to opinions as follows: Defendant’s intent when he fatally stabbed Berg and the Rice boy was to obtain sexual sadistic gratification, to torture, and to bill. The intent to torture and kill was deliberately formed and premeditated before defendant inflicted any wound. Before he met Berg or Rice defendant had planned that when he found a suitable victim under circumstances in which he believed he could escape detection he would kill.
At the trial on the sanity issue defendant, the three pre *41 viously mentioned court-appointed physicians, and Dr. Frederick Hacker, another court-appointed psychiatrist who had examined defendant, were called by the defense and testified to their opinions that defendant was legally sane. Dr. Douglas M. Kelley, a psychiatrist who became interested in defendant and was afforded opportunity to talk with him without defendant’s knowing that Kelley was a physician and psychiatrist, testified for the People to the same opinion. The doctors explained that they used the M’Naughton test. Defendant explained that he knew, and “Any seven year old child knows,” that “according to your laws” defendant’s homicides were wrong and subject to the death penalty, but that in defendant’s opinion his slayings were not wrong “because I am perfectly justified in every carcass I got. ... I figured that all out. ... If you want some carcasses you have to pay with your own. That is quite all right as long as you get enough of them.” Asked by the prosecutor whether it was “a fair statement” that “You can’t and will not conform” to the laws and the rules of society, defendant replied, ‘ ‘ That is correct! Exactly it! I don’t have to, with a knife in my hand. ’ ’
Defendant, according to his testimony and repeated extrajudicial admissions, had committed 11 homicides including the two for which he was on trial. Five of these he described and police investigation confirmed their commission; others could not be confirmed, for defendant refused to disclose the identity of the victims and the place of the killings because no one would pay him for the information. Defendant, although voluble, also refused to answer some inquiries as to his reactions because, as he testified, they were “money questions.” Throughout defendant’s testimony and extrajudicial declarations runs the theme that law-enforcement officials, psychiatrists, representatives of media of public communication, and even the trial judge and jury should pay defendant for disclosing his actions, thoughts, and feelings. Defendant gave elaborate pseudo-scientific explanations of the reasons for his killings and his asserted belief that they were justified.[2]
*42 The instructions[3] on the issue of insanity are based upon the M’Naughton rule. Defendant did not request instructions presenting any other rule, but from the proceedings during the taking of testimony and from the hereinafter described state of the California law it is obvious that any such request would have been useless and we do not at all *43 base our decision upon defendant’s failure to request different or additional instructions. A history of M’Naughton in this state is as follows:
The basic M’Naughton rule (stated ante, footnote 1) was approved in People v. Coffman (1864), 24 Cal. 230, 235. In 1872 when the Legislature enacted the Penal Code (including the provision of section 21 that “All persons are of sound mind who are neither idiots nor lunatics, nor affected with insanity” and the provision of section 26 that “All persons are capable of committing crimes, except ... 3. Lunatics and insane persons”) it presumably had the Coffman decision in mind and intended to leave its definition of insanity in effect (see Cole v. Rush (1955), 45 Cal.2d 345, 355 [8-9] [289 P.2d 450, 54 A.L.R.2d 1137]). Also the Political Code, to be construed as passed at the same moment and part of the same statute as the Penal Code (Pol. Code, § 4480), provided (§ 4468) that “The common law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of this State, is the *44 rule of decision in all the courts of this State.” And the code commissioners cited the Coffman case in their note to subdivision 3 (supra) of Penal Code, section 26 (hereinafter quoted in full) and, quoting from that ease in their note to section 1016 of the Penal Code (under which the issue of insanity was formerly raised by the plea of not guilty; as hereinafter stated, our code has since been amended to provide for specific plea of, and separate trial of the issue of, not guilty by reason of insanity), stated that “The unsoundness *45 of mind, or insanity,[4] that will constitute a defense in criminal actions is well described by Tindal, in M’Naughton. (Italics of the code commissioners.)
Promptly after the adoption of the Penal Code, there was judicial reiteration of the basic M’Naughton rule (People v. M’Donnell (1873), 47 Cal. 134, 135, 136-137) and rejection of the irresistible impulse test (People v. Hoin (1882), 62 Cal. 120, 123 [45 Am.Rep. 651]). And in People v. Kerrigan (1887), 73 Cal. 222, 224-225 [14 P. 849], the court recognized that authorities cited by the appealing defendant “support his contention that ‘moral insanity is now as well understood by medico-jurists, and almost as well established by judicial recognition, as the intellectual form,’ ” but adhered “with confidence” to the M’Naughton rule and approved an instruction that “In our courts of law there is no such doctrine established or recognized as moral insanity, distinguished from mental derangement, as an excuse for crime.”
People v. Hubert (1897), 119 Cal. 216, 221 [51 P. 329, 63 Am.St.Rep. 72], adapted from M’Naughton (p. 932 of 4 St. Tr. (N.S.), p. 723 of 10 Clark & Fin., p. 211 of Eng. Rep.) the following test: “If the defendant had certain special delusions which completely possessed him, but was perfectly sane on all other subjects, . . . then he must be judged as though the facts with respect to which the delusions exist were real.” Rejecting the irresistible impulse test, the Hubert case held (p. 223 of 119 Cal.), “conceding that the act was the offspring of an irresistible impulse, and the impulse was irresistible because of mental disease, still the defendant must be held responsible if he at the time had the requisite knowledge as to the nature and quality of the act, and of its wrongfulness.” This holding was said to be supported on two policy grounds: difficulty of proof (“We do not know that the impulse was irresistible, but only that it was not resisted”), and the expectation that fear of punishment will restrain persons whose power of self-control is impaired by mental disease (“when the will power is weakened, although the mentality is not at all or only slightly impaired, the fear of punishment must be of some value as a restraint, and the class of people referred to need that restraining influence”). The court (p. 224 of 119 Cal.) recognized that “There are doubtless some cases . . . *46 in which the fear of punishment does not restrain, but where the rule works manifest injustice the unfortunate defendant is in some way saved from punishment.”[5]
Apparently concerning the question whether the legal formulation as to insanity which renders a defendant incapable of crime should include some express requirement of causal connection between the insanity and the criminal act,[6] the court in People v. Hubert (1897), supra, 119 Cal. 216, 223, had this to say:
“It has been proposed as a rule to leave it to the jury to say whether the act was the offspring of insanity, meaning, I presume, whether the defendant would have committed the act had he not been insane.
“There are many degrees of mental unsoundness. Some cases could only be detected by a very stilled expert. Some cases of mental unsoundness might be known only to very intimate acquaintances, and perhaps by them only noticeable under peculiar conditions. But, however slight the defect, only Omniscience can say whether the act would have been committed had the taint not existed. It is an impracticable rule.”
The M’Naughton rule continued to be accepted in California, over arguments that it was unscientific (e.g., People v. Sloper (1926), 198 Cal. 238, 245-246 [1-3] [244 P. 362]), at the time the Legislature in 1927 (Pen. Code, §§ 1016, 1017, 1020, 1026; Stats. 1927, ch. 677) provided for the specific plea and separate trial of the issue of not guilty by reason of insanity.
*47 The 1927 legislation upon its face effected only procedural changes (People v. Hickman (1928), 204 Cal. 470, 474-480 [1-10] [268 P. 909, 270 P. 1117]; People v. Davis (1928), 94 Cal.App. 192, 194-197 [1] [270 P. 715]; People v. Troche (1928), 206 Cal. 35, 42-45 [1-5], 48-49 [11-12] [273 P. 767]; People v. Leong Fook (1928), 206 Cal. 64, 70 [1], 74-76 [4-5] [273 P. 779]) but it is apparent that the Legislature had in mind the substantive law as to insanity because the reason for making the procedural changes was “to overcome some of the abuses which have crept into the administration of justice by reason of the frequent interposition of the defense of insanity in criminal prosecutions.” (People v. Hickman (1928), supra, 204 Cal. 470, 477; see Shepherd, Not Guilty by Reason of Insanity (1928), 2 So.Cal.L.Rev. 53; Shepherd, The Plea of Insanity (1929), 3 So.Cal.L.Rev. 1.) Again in 1927, as in 1872, the Legislature presumably knew of the existing domestic decisional law as to the substantive definition of the insanity which constitutes a defense to a charge of crime, and intended not to change it. (Cole v. Rush (1955), supra, 45 Cal.2d 345, 355 [8-9].) Rather, its use of the judicially construed word insanity in legislation on that subject indicated its intent that the definition should be continued (Perry v. Jordan (1949), 34 Cal.2d 87, 93 [5] [207 P.2d 47]) and the court promptly recognized that intent by reiterating, in one of the most important cases which upheld the validity of the 1927 legislation, the M’Naughton view with its assumption that reason can operate in a separate compartment of the mind, unaffected by mental disorder such as “partial insanity” or “moral insanity” or “insane delusion or hallucination” or “irresistible impulse,” to appraise right and wrong and choose the right, and then reach out of its compartment and prevent wrong conduct which the insane portions of the mind would initiate. (See People v. Troche (1928), supra, p. 46 [7] of 206 Cal.) Indeed, the court in People v. Leong Fook (1928), supra, 206 Cal. 64, 72 [3], undertook to erect still another wall in the compartmental concept of insanity when it said, in explanation of the legislative provision for a separate trial on the issue of insanity, that “proofs of insanity . . ., in the nature of things, and as a rule, are separable from the facts and circumstances attending the commission of the homicide.” (The questionableness of this view is fully presented in the dissents of Justice Preston in the Troche (p. 51 of 206 Cal.) and Leong Fook (p. 78 of 206 Cal.) cases; we cannot agree with those dissents, however, that the provision for *48 separate trial of the insanity issue is so unreasonable as to make the legislation invalid.)
The issue which the Legislature, by the 1927 enactment, took out of the trial on the general issue was a narrow one—insanity as defined by the M’Naughton rule, not all questions of mental disease or disorder. This was recognized in People v. Selph (1930), 106 Cal.App. 704, 707 [289 P. 918], explained in People v. Wells (1949), 33 Cal.2d 330, 346-357 [202 P.2d 53] (see also the dissenting opinions in Wells), and has since been further developed in such cases as People v. Baker (1954), supra, 42 Cal.2d 550, and People v. Gorshen (1959), supra, 51 Cal.2d at p. 716. During the same period that this court was developing the concepts of Wells, Baker, and Gorshen, we had occasion to say (in People v. Daugherty (1953), 40 Cal.2d 876, 894 [256 P.2d 911]) that M’Naughton “has been followed consistently [citation] despite voluminous critical writings on the subject. It is the generally accepted rule. [Citations.] Defendant has not offered a more workable test and if it is to be changed his argument should be addressed to the Legislature. Indeed, such attempts have been made without avail.” And in People v. Berry (1955), 44 Cal.2d 426, 433 [8] [282 P.2d 861], we unanimously repeated that arguments for change in the test should be made to the Legislature rather than the courts.
Since 1953 (when we decided Daugherty) and 1955 (when we decided Berry) the criticisms of M’Naughton and the reasons for our conclusion that applications for alteration of the rule should be addressed to the Legislature have not significantly changed. A proposal of defense counsel points up reason for our previous and continued reluctance to assume the expertise which would be required to formulate new standards or (as in the formulae proposed on behalf of defendant)[7] *49 to leave the question whether the particular defendant suffers from a “mental disease or defect” which would require a finding of not guilty by reason of insanity to be explained by evidence of experts in medicine and psychology and decided by the jury without any legal test. Defense counsel asked that we appoint not less than three forensic psychiatrists to consult with and advise them and counsel for the People in preparation for oral argument and to appear before this court as its friends and give testimony to aid in a reexamination of M’Naughton and resolution of the “mixed questions of law and fact” which counsel say are presented on this appeal. The advancement of this proposal indicates that the reexamination should be by the Legislature, which is equipped for fact-finding, rather than by this court, which is traditionally disinclined and functionally not equipped to perform the fact-finding operation.
A verdict on a plea of not guilty by reason of insanity is not merely an acceptance or rejection of a medical diagnosis, or a decision that punishing the accused would or would not be therapeutic for him. Nor is it purely a determination that society would be better protected, on the one hand, by execution of the accused or his confinement in an institution set up under the Penal Code, or, on the other hand, by his confinement in an institution set up under the Welfare and Institutions Code. By their decision on the insanity plea the jury are to some extent expressing ancient convictions that society can properly punish the man who offends it because the punishment is a sort of justified collective purge or vengeance; a purge to rid society of the offender and thereby to protect it, and vengeance to show retribution on the transgressor, thereby to deter others and thus to protect society. These strong persuasions of society may seem to some rather strikingly related to the rationalizations of defendant Nash, but such long established convictions cannot be adjudicated out of existence and we think that legal formulae designed to deal with them should come from the broad base of the Legislature, which is pre *50 sumably more closely in touch with and sensitive to the views of the citizenry on this controversial subject than are the courts. There is danger in judicial changes of long-established rules of law when such changes proceed from a court’s assumption that it can recognize what has become a fact of a social science.
The law as it is now understood and applied in California recognizes that all men are not endowed with equal intellectual capacity or similar moral convictions, but it requires, for the protection of society, that all conform to certain minimal standards of social interaction. The general structure of criminal responsibility for an individual’s acts is said to be based on the “posit that each normal person intends to do the act which he does do and that such intention is based upon the exercise of free will.” (Bernard L. Diamond, M.D., With Malice Aforethought (1957), 2 Archives of Criminal Psycho-dynamics, No. 1, quoted in People v. Gorshen (1959), supra, 51 Cal.2d at pp. 716, 724, footnote 4.) Although the law requires compliance with its standards by all persons it does not impose criminal sanctions on all persons. Penal Code, section 26 provides:
“All persons are capable of committing crimes except those belonging to the following classes:
‘ ‘ One. Children under the age of fourteen, in the absence of clear proof that at the time of committing the act charged against them, they knew its wrongfulness.
“Two. Idiots.
“Three. Lunatics and insane persons.
“Four. Persons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent.
“Five. Persons who committed the act charged without being conscious thereof.
“Six. Persons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence.
“Seven. Married women (except for felonies) acting under the threats, command, or coercion of their husbands.
“Eight. Persons (unless the crime be punishable with death) who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused. ”
*51 The law also specifies (Pen. Code, § 1367) that “A person cannot be tried, adjudged to punishment, or punished for a public offense, while he is insane. ’ ’[8]
*52 From the foregoing discussion and the quoted statutory law it would appear to follow that, excepting only in cases where the death penalty may be imposed, it is relatively unimportant to society and to the accused whether the determination as to criminal responsibility insofar as it may rest on the issue of sanity is made at the time of initial trial or later. The immediately important question for both the state and the defendant is this: Did the defendant commit the act charged ? If he committed it, sane or insane, he should be held under restraints adequate and appropriate to the circumstances. If the circumstances require actual confinement it *53 is not at the moment important what name be applied to the institution. The character of the supervision and study to be given the accused is important. As a result of such study it is conceivable that eventually a more informed diagnosis of the defendant and of his act might be accomplished and treatment appropriate to illness or evil disposition be applied. But our statutes do not yet authorize such procedure and, in this case, the death penalty has been imposed; accordingly, we must resolve the issues on the law as it now stands.
The most difficult problem arises in formulating for the trial process a just, understandable, and workable hypothesis for separating the insane from the sane insofar as criminal responsibility is concerned. Dr. Diamond in the above cited study (With Malice Aforethought) concedes that “Medical psychology has embarrassingly few answers to this one question which the criminal law is most interested in. It does no good to proclaim to the jurist that scientific evidence proves that there is no such thing as free will. There is a subjective phe-, nomenon which the normal individual experiences as free will. Illusory or not, free will remains the basis of all criminal law *54 simply because free will is the basis of all normal social behavior.”
This quoted statement is of little help to us in connection with the present problem because it concerns “normal social behavior,” whereas we are dealing with the abnormal. The circle appears complete when we note that the very purpose of criminal law is to prevent abnormal behavior and protect society against it to the extent that such departures from the normal would destroy or impinge on recognized rights of other members of the social order. More directly addressed to our problem, Dr. Diamond’s article continues: “In truth, today, we do not have a sufficient foundation of scientific knowledge about the ego functions of decision, choice, and determination of action to justify the formulation of any general principles which could be applied to the law.....
“The task then becomes to understand the motivations, intent, and actions of the individual who deviates from the common-sense posit of free will. This can be accomplished without specious generalizations which would attack the very structure of the law itself and would compel non-acceptance by the juridical mind. ...”
The “alienists” appointed by the court “to examine the defendant and investigate his sanity” (Pen. Code, § 1027) directed their investigations and their testimony to the question whether this defendant met the tests of accountability established by existing California law. The evidence that he did meet those tests is overwhelming. The instructions are intelligently formulated and adequately comprehensive to inform the jury of that law and require their compliance with it. No prejudicial error appears.
For the reasons above stated the judgment and order.appealed from are affirmed.
Gibson, C. J., Shenk, J., Traynor, J., Spence, J., and McComb, J., concurred.

Queen v. M’Naughton (1843), 4 St.Tr. (N.S.) 847, 931, M’Naughton’s Case (1843), 10 Clark & Fin. 200, 210, 8 Eng.Rep. 718, 722, and this court (e.g., People v. Gorshen (1959), 51 Cal.2d at pp. 716, 726 [336 P.2d 492], footnote 5) state the basic rule as follows: that at the time the accused committed the act he was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of his act or, if he did know it, that he did not know that he was doing what was wrong.

The following account is taken from defendant’s interviews with psychiatrists and his testimony. The quoted language is chiefly that of defendant.
Defendant did not remember his natural parents and believed that he was illegitimate. He was circumcised and believes that “society” had no right to interfere with Ms body in this fashion. His foster-father was weak. Defendant was subjected to strict discipline and unprovoked cruelty by his foster-mother and in parochial schools. He became eon *42 vinced that Christians are hypocrites and that there is a “price tag" on charity. Also his foster-parents and the parochial schools left him sexually ignorant and inhibited.
By the time defendant entered public high school he was “an emotional wreck." “It was a mental impossibility" for him to make “adjustments that a child must make, to be ready for that kind of freedom." As a child, defendant testified, he recognized his inability to “face reality," but “Ever since I got a knife, I make my reality. I can face it very easily." Defendant left high school after less than a year. He served for more than a year in the Civilian Conservation Corps, which “seemed to be the ideal setup for me" because there was “just enough discipline and just enough laxity." Then, during more than a year of private employment in various jobs and states, defendant “made a fairly good adjustment, other than, let’s say, sex."
Immediately after the Pearl Harbor attack defendant enlisted in the Army. For a year “I made a good soldier" (but “I wouldn’t be a good one overseas" because “I didn’t have nothing to die for. I hadn’t done any living yet"). Then “this instability really showed itself" and, after twice being A.W.O.L., defendant, to avoid the punishment of imprisonment, announced that he was homosexual and was discharged. Defendant considers this admission of homosexuality “one of the greatest mistakes in my life.’’
Defendant spent the next few years drifting from one odd job to another. He committed a series of “strong-arm robberies" for which he was never apprehended, although he was jailed several times for “suspicion of robbery" and for minor offenses. In 1945 he was confined for psychiatric examination for five days in Los Angeles County General Hospital, “railroaded" to a Veterans Hospital for 28 days, and released as mentally sound.
In 1948 defendant was convicted of “grand theft from the person” and sent to San Quentin Prison. He is bitterly resentful because he was imprisoned for a longer time than is usual for a first offender. He was paroled in 1953 and after six months he had an argument with his parole officer and was returned to San Quentin as “unadaptable to outside conditions." He was again released in 1955.
While defendant was in San Quentin he determined to revenge himself upon society by murdering. He first thought of derailing a train, then decided that this would not be sufficiently personal (“When you get a train you get a bunch of old fogeys who have nothing to live for anyway"); that he would prefer to “know his customers"; that he would give “top priority" to sailors (because they had much sexual freedom and because they 1 ‘rolled queers’’) ; then, to children (because they had more to anticipate than adults and because their deaths would cause their parents suffering and destroy their hopes and ambitions for the children’s future); and, “if I got tired of the first two, . . . girls, anywheres from fifteen, eighteen, twenty, something like that, years of age. ’ ’
When defendant was released from San Quentin in 1955 he tried unsuccessfully to enlist in the Merchant Marine. He then went from

Footnote [3] begins on page 43. *43 place to place, sometimes worked at odd jobs, and committed homicides pursuant to his plans to revenge himself on society. The victims of the killings which defendant described were civilian homosexual "pick-ups” and the Eice child. Defendant was particularly pleased when his victims "had something to live for.”
Defendant’s first killing was in December, 1955. A few days thereafter he was arrested for assault upon another homosexual "pick-up,” convicted of a misdemeanor, and served six months. At this time he was examined by two psychiatrists who determined that he was not a sexual psychopath. After his arrest on the present charges defendant, in talking with Dr. Kelley, described these examinations and explained "how you go about fooling some psychiatrists. ’ ’
The climax of defendant’s thinking about Christian hypocrisy, money, and the importance of Ms information was Ms proposal, fantasy, or wish that shortly before his execution some high official, in a televised ceremony, would pay him a large sum in return for the disclosures which he had withheld; with this sum defendant proposed, in order to have the satisfaction of mocking Christianity, to purchase a Catholic funeral and burial because "it is against the Catholic Church laws to bury a person in a Catholic graveyard dying under such circumstances,” but "For enough money, they will do anything.”

The pertinent instructions (with their relation to California Jury Instructions Criminal (1958) indicated in our bracketed inserts) are as follows:
_“[From CAL JIG 801.] Insanity, as the word is used in these instructions, means such a diseased and deranged condition of the mental faculties of a person as to render Mm incapable of knowing the nature and quality of his act and of distinguishing between right and wrong in relation to the act with which he is charged.
"The test of accountability is this: Did the party have sufficient mental capacity to appreciate the character and quality of the act? Did he know and understand that it was a violation of the rights of another, *44 and in itself wrong? If he had the capacity thus to appreciate the character and to comprehend the probable or possible consequences of his act, he was sane under the law, and is responsible to the law for the act thus committed.
‘ ‘ [Formulated by the People.] An offender cannot set up his own standard. The test of accountability, defined in the previous paragraph, when applied by you to the evidence in this ease during your deliberations, contemplates the standard of a law abiding society. . . .
“ [CALJIG 802.] Whenever partial insanity or insane delusion or hallucination is relied upon as a defense to crime, the evidence, to make that defense good, must show that the crime charged was the product or offspring of such insanity, insane delusion, or hallucination, and not the result of some sane reasoning and natural motive.
1 ‘ Although a person may be laboring under partial insanity or suffers from some insane delusion or hallucination, still if he understands the nature and character of his action and its consequences, and if he knows that it is wrong, such partial insanity or delusion or hallucination will not relieve him from responsibility for the act if it otherwise is criminal.
‘ ‘ [Formulated by the People.] Temporary insanity as a defense to crime is as fully recognized by law as is insanity of long duration. The test is as I previously have stated, and applies to the time when the act charged was committed. If at that time the defendant was insane, he must be found not guilty of the crime charged, even if he was sane at earlier and later times or at any earlier or later period.
“[CALJIG 804.] Where a person charged with crime interposes the defense of insanity, and the proof shows that he was afflicted with a form of insanity wherein at times he was insane and irresponsible and, at other times that we call lucid intervals, he was able to distinguish between right and wrong and to know the nature and quality of his acts, the law, if and after finding that he committed the act, presumes that it was committed during one of the defendant’s lucid intervals. That presumption may be rebutted but is controlling until overcome by a preponderance of evidence showing that the defendant was insane at the time when the offense charged was committed. . . .
[CALJIC 80S.] Moral insanity, as an independent state, is not recognized by law as a defense to crime, and does not constitute such insanity as is a legal defense. Moral insanity, in itself, is not a bar to responsibility for criminal acts; hence, howsoever perverted, if at all, the feelings, conscience, affections and sentiments of a person may be, unless the intellectual faculties and reasoning powers are so affected by mental disease as to render him incapable of distinguishing between right and wrong in relation to the act with which he is charged, he is responsible to the law for his criminal acts.
“[CALJIC 806.] The law does not recognize the plea of irresistible impulse as a defense to crime. If a person is conscious of, knows and appreciates the nature and wrongfulness of his act, then he does the act at his peril, and the plea of irresistible impulse will not avail him.”

Because of the narrow definition of the insanity which renders a defendant incapable of crime, we have since recognized that “ ‘ Sound mind’ and legal sanity’ are not synonymous.” (People v. Baker (1954), 42 Cal.2d 550, 568 [268 P.2d 705].)

Naturally, since California has never accepted the irresistible impulse test, it has never had occasion to concern itself with the familiar complaint (see Durham v. United States (1954), 214 F.2d 862, 873-874) that the test misleadingly appears to be limited to a sudden inclination to commit an unlawful act, whereas many mental illnesses are characterized by brooding and reflection concerning, and sometimes by long, unsuccessful struggles against, commission of the unlawful act.

State v. Filce (1869), 49 N.H. 399 [6 Am.Bep. 533]; State v. Jones (1871), 50 N.H. 369 [9 Am.Bep. 242]; and Durham v. United States (1954), supra, 214 F.2d 862, take the view (as stated in Durham, pp. 874-875 [9] of 214 F.2d) that “an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect” (italics added). Durham says that the jury should be told that, to find the defendant not guilty by reason of insanity, they must find not only that he was suffering from mental disease or defect but also that there was a causal connection between such mental abnormality and the unlawful act (p. 875 [12] of 214 F.2d).
The American Law Institute Model Penal Code (Tent. Draft No. 4, 1955), 5 4.01, Comment 5, p. 159, rejects the Durham formulation because of .the "ambiguity of ‘product’ ”; i.e., a "but for” test of causality could rarely be answered affirmatively, and the Durham formulation does not make clear whether it intends causality which involves "total incapacity” or causality which involves "substantial incapacity.”

Defense counsel propose a New Hampshire and Durham-like rule; i.e., defendant is not criminally responsible if his unlawful act was the product of mental disease or defect.
Amicus curiae proposes the following formula:
‘ ‘ (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.
"(2) The terms ‘mental disease or defect’ do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct.
“ (3) ‘Substantial capacity’ shall be deemed to be lacking if an expression or manifestation of mental disease or defect is a substantially influencing factor in the commission of the unlawful act. ’ ’
The first two paragraphs of the amicus curiae formula are proposed *49 by the American Law Institute Model Penal Code (Tent. Draft No. 4, 1955), § 4.01, p. 27. The third paragraph introduces a suggestion of the element of causal connection between mental disease or defect and unlawful act. The Institute, as indicated ante, footnote 6, rejected Durham because of the problems of stating the “mode of causality.’’ Instead the Institute recommends a formulation (in this respect like M’Naughton) under which, for acquittal on the ground of not guilty by reason of insanity, the trier of fact is told to find temporal coincidence of mental disease (resulting in a described incapacity) and unlawful act.

Other pertinent Penal Code provisions concerning the insane defendant in a criminal ease are the following:
Generally concerning insanity while the action is pending and prior to judgment:
Pen. Code, § 1368: “If at any time during the pendency of an action and prior to judgment a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be determined by a trial . . . and ... all proceedings in the criminal prosecution shall be suspended until the question of the sanity of the defendant has been determined. ...”
Pen. Code, $ 1370: “If the jury finds the defendant sane, the trial must proceed, or judgment be pronounced, as the case may be. If the jury finds the defendant insane, the trial or judgment must be suspended until he becomes sane, and the court must order that he be in the meantime committed ... to a state hospital for the care and treatment of the insane. ...”
Pen. Code, § 1372: “If the defendant is received into the state hospital he must be detained there until he becomes sane. When he becomes sane, the superintendent must certify that fact” and defendant must be returned to the court for criminal trial or judgment.
Specifically concerning insanity when the court sets the time for pronouncing judgment or thereafter until defendant appears for judgment:
Pen. Code, $ 1191: When the superior court appoints a time for pronouncing judgment of conviction, “If in the opinion of the court there is a reasonable ground of believing a defendant insane, the court may extend the time for pronouncing sentence until the question of insanity has been heard and determined, as provided in this code.” (Pen. Code, § 1449, concerns the procedure when this problem arises in an inferior court.)
Specifically concerning insanity when a convicted defendant appears for pronouncement of judgment:
Pen. Code, $ 1201: “He may show, for cause against the judgment: 1. That he is insane; and if, in the opinion of the court, there is reasonable ground for believing him insane, the question- of insanity must be tried. ... If, upon the trial of that question, the jury finds that he is sane, judgment must be pronounced, but if they find him insane, he must be committed to the state hospital for the care and treatment of the insane, until he becomes sane; and when notice is given of that fact . . . he must be brought before the court for judgment.”
Concerning insanity after delivery of the convicted defendant to the warden for execution of the death sentence:
Pen. Code, § 3701: “If, after his delivery to the warden for execution, there is good reason to believe that a defendant, under judgment of death, has become insane, the warden must call such fact to the attention of the district attorney of the county in which the prison is situated, whose duty it is to immediately file in the superior court ... a petition . . . asking that the question of his sanity be inquired into. Thereupon the court must at once cause to be summoned and impaneled ... a jury of 12 persons to hear such inquiry.”
Pen. Code, § 3703: “ [W]hen it is found that the defendant is insane, the order must direct that he bo taken to a State hospital for the insane, and there kept in safe confinement until his reason is restored.”
Pen. Code, $ 3704: “If it is found that the defendant is sane, the *52 warden must proceed to execute the judgment . . .; if it is found that the defendant is insane, the warden must suspend the execution . . . and deliver the defendant ... to the medical superintendent of the hospital . . . When the defendant recovers his sanity, the superintendent of such hospital must certify that fact to the judge of the superior court from which the defendant was committed as insane, who must thereupon fix a date upon which ... a hearing shall be had before said judge sitting without a jury to determine whether or not the defendant has in fact recovered his sanity. ... If the judge should determine that the defendant has recovered his sanity he must certify that fact to the Governor, who must thereupon issue to the warden his warrant appointing a day for the execution ... If, however, the judge should determine that the defendant has not recovered his sanity he shall direct the return of the defendant to a state hospital for the insane, to be there kept in safe confinement until his sanity is restored.”
Concerning the defendant who is found not guilty by reason of insanity:
Pen. Code, § 1026: ”... If the verdict or finding be that the defendant was insane at the time the offense was committed, the court unless it shall appear to the court that the defendant has fully recovered his sanity shall direct that the defendant be confined in the state hospital for the criminal insane ... If, however, it shall appear to the court that the defendant has fully recovered his sanity such defendant shall be remanded to the custody of the sheriff until his sanity shall have been finally determined in the manner prescribed by law. A defendant committed to a state hospital shall not be released from confinement unless and until the court . . . shall, after notice and hearing, find . . . that his sanity has been restored.”
Pen. Code, § 1026a: “An application for the release of a person who has been committed to a state hospital, as provided in Section 1026, upon the ground that his sanity has been restored, may be made to the superior court . . . No hearing upon such application shall be allowed until the person committed shall have been confined for a period of not less than 90 days from the date of the order of commitment. If the finding of the court be adverse to releasing such person ... he shall not be permitted to file a further application until one year has elapsed from the date of hearing upon his last preceding application.”
The Welfare and Institutions Code (§§ 5000-5189) provides for the commitment and treatment of mentally ill persons. “Insane” as used in that code means.”mentally ill” (§5041). ” ‘Mentally ill persons’ means persons who come within either or both of the following descriptions: (a) Who are of such mental condition that they are in need of supervision, treatment, care, or restraint, (b) Who are of such mental *53 condition that they are dangerous to themselves or to the person or property of others, and are in need of supervision, treatment, care, or restraint” (§5040). (This is the test which defendant passed in 1945, about the time when he was engaged in a series of “strong-arm robberies” for which he was not apprehended; ante, footnote 2.)
Also the Welfare and Institutions Code (§§ 5500-5521) provides for adjournment of a criminal proceeding while the court determines whether the defendant is a “sexual psychopath” and for disposition of such a person. A “sexual psychopath” is defined (§ 5500) as one “affected, in a form predisposing to the commission of sexual offenses, and in a degree constituting him a menace to the health or safety of others, with any of the following conditions: (a) Mental disease or disorder, (b) Psychopathic personality, (c) Marked departures from normal mentality.” (This is the test which defendant passed in 1955 after he had embarked upon his series of homicides; ante, footnote 2.)
Furthermore the Welfare and Institutions Code (§§5600-5607) provides for court determination that a person against whom no criminal charge is pending is a “mentally abnormal sex offender,” and for commitment and treatment of a person found to be such an offender. A “mentally abnormal sex offender” is one “who is not mentally ill or mentally defective, and who by an habitual course of misconduct in sexual matters has evidenced an utter lack of power to control his sexual impulses and who, as a result is likely to attack or otherwise inflict injury, loss, pain or other evil upon the objects of his uncontrolled and uncontrollable desires.” (Note that the Legislature here indicates that in its opinion a person may have ‘ ‘ uncontrollable desires ” and yet be “ not mentally ill.”)
Finally, it is noted, under our statutory law “ ‘Insanity’ may and does mean a variety of different things. Depending on the pertinent statute, a variety of issues of fact can be the subject of litigation.” (In re Zanetti (1949), 34 Cal,2d 136, 141 [3] [208 P.2d 657].)