[Crim. No. 19371. Second Dist., Div. Five. Dec. 16, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS JAMES WILLIAMS, Defendant and Appellant.

## COUNSEL

Joseph E. Gerbac, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Howard J. Schwab and Norman H. Sokolow, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

REPPY, J.—In this case, wherein defendant double-parked his car in front of an eye clinic of which he had never been a patient, walked in, approached the reception window and with a carbine rifle shot and killed an optician with whom the evidence indicated he had no connection, and walked out and drove away, the only serious issue at trial was whether or not defendant was in the throes of a psychomotor epileptic attack as a result of which he lacked the consciousness to be aware of his actions or to deliberate upon the gravity of his act, premeditate, and harbor malice.

In a trifurcated trial the jury in the first phase found defendant guilty of murder in the first degree, in the second phase found that defendant was sane at the time of commission, and in the third phase set the penalty at life imprisonment. In light of our conclusions we deal only with the first phase.

Defendant's main contention is, in effect, that as a matter of law, the evidence established a reasonable doubt that defendant was conscious of his actions or had the capacity to attain the necessary mental state. Actually, however, as we see it, in this case there were not two separate concepts. Only the circumstance of psychomotor epileptic attack was posed. These perhaps theoretically distinct defenses could not possibly have been independent in the instant case to the extent that one could have been found to exist and the other not. Under the evidence produced in support of the defense, if defendant had a psychomotor epileptic seizure which rendered him unconscious of what acts he was performing, it also made it impossible for him to harbor at the time of commission the specific intents for murder or voluntary manslaughter. The type of unconsciousness stressed by the psychiatrists was a totally diminished, i.e., lack of, capacity in defendant to be aware of his actions or to engender the specific intent requisite to the offenses involved.[1] Hereafter, at times, we will refer to the alleged state of defendant as "totally diminished capacity."

We do not feel that it can be said that the evidence rests in the posture conceptualized by defendant. The testimony of Dr. Walters (which was detailed and thorough) and the conduct of defendant before and after the incident (particularly after) support the position of the prosecution that defendant was aware of and intended what he did. The contrary

---

[1] A note from the jurors in the insanity phase of the trial shows that their verdict turned on the issue of consciousness versus unconsciousness.

See later discussion concerning jury instructions wherein this concept is a pertinent feature.

testimony of Dr. Abe and Dr. Marcus had certain weaknesses. The testimony of Dr. Thompson on that particular issue was not of the positive variety. His chief contribution was to present the analysis of the electroencephalogram (EEG) which he made. Also, he felt that it would be unwise for a psychiatrist to express an opinion on the likelihood of there having been a psychomotor attack without having the benefit of a neurological examination. Under the circumstances we are satisfied that that major issue was a jury question. (Cf. *People* v. *Rittger,* 54 Cal.2d 720, 730 [7 Cal.Rptr. 901, 355 P.2d 645]; *People* v. *Berry,* 44 Cal.2d 426, 432 [282 P.2d 861] [overruled on another point in *People* v. *St. Martin,* 1 Cal.3d 524, 537 (83 Cal.Rptr. 166, 463 P.2d 390)].)

█ Nevertheless, the decision was a close one. Three psychiatrists testified, in effect, that it was probable that defendant was in a psychomotor epileptic fugue: Dr. Abe[2] and Dr. Marcus quite positively; Dr. Thompson somewhat guardedly because he had not made a psychiatric examination himself as had the other two and was responding only from the information put in a hypothetical question and results of his EEG. Dr. Walters conceded to defense counsel that it was possible.[3] Male and female friends of defendant gave testimony of current conduct symptomatic of a person having the type of epilepsy which would produce psychomotor seizures. Defendant's mother and sister, although subject to juror suspicion of consanguinal bias, testified concerning babyhood convulsive episodes. The EEG demonstrated abnormality in the areas wherein the pertinent brain activity is located.[4] Seemingly, the prosecution's investigative arm had been unable to develop any direct or strong circumstantial evidence to present in the trial bearing upon motive. Apparent absence of motive plus the commission of the offense under circumstances conducive to identification and apprehension were factors running contra to a first degree murder, but supportive of a fugue, mental state. This was a circum-

---

[2]We note that at one point the trial court, in the process of controlling the extent of interrogation, expressed the view that Dr. Abe had made "a substantial impact upon the jury." However, at the time of the motion for new trial, the trial court expressed the view that the jurors apparently had not given "weight to the testimony of the defense psychiatrists."

[3]Dr. Walters, upon questioning by the district attorney, by reading from his report, conceded a remote possibility that defendant could have had the variety of epileptic seizure which altered his state of consciousness. When defense counsel questioned Dr. Walters about this statement in his report, he responded by dropping the adjective "remote" and replied, "That is possible, yes."

[4]Dr. Thompson said this could be both the frontal and temporal lobes with greater stress on the latter. Other doctors focused on the temporal lobes. The second regular EEG showed abnormality in the frontal lobes. The EEG after alcoholic stimulation showed abnormality in these lobes and in the right temporal. The concept appears to be that the alcoholic stimulation intensifies the abnormality.

stance difficult to discount both by medical and lay reasoning. The jury deliberated from 10 a.m. to 4 p.m. on Friday, August 28, 1970, and from 9 a.m. to 3 p.m. on Saturday, August 29, when it was locked up for the weekend. On Monday, August 31, it deliberated from (apparently) 9 a.m. until 2:05 p.m., when it returned to the courtroom to have certain testimony read to it. Earlier that day it had sent a note to the trial court requesting that the testimony of Dr. Thompson and Mr. Mykietyn (the one time brother-in-law and coworker of the deceased) be read to it. While this item was being considered by court and counsel about 11:30 a.m., along with certain problems concerning the daily transcript, the jury sent another note to the trial court advising that it was unable to reach a verdict. The trial court, realizing that the jurors had not had the benefit of rehearing the testimony that they had requested to have read to them, sent a note back to the jurors asking if the reading of that testimony would make any difference in their determination as to whether or not they could arrive at a verdict. Apparently, at just about noon, the jurors sent back a note saying they wished to hear the testimony of Dr. Thompson since it would help them in reaching a verdict. As indicated, commencing at 2:05 p.m. the reporter commenced reading the desired testimony. This was concluded at 3:40 p.m. when the jurors again retired. At 4:50 p.m. the jurors returned to court and presented their verdict finding defendant guilty of murder in the first degree.

This probable difficulty in decision is mentioned because there are errors and near improprieties in the case which taken together spell prejudice. Any one of the defects, as a sole irregularity in the face of a strong prosecution case, would probably not be considered prejudicial, but the totality of all the matters to be discussed, in combination, in light of the demonstrably close case herein, does reach, we feel, the level of harmful prejudice.

One of the problems is captioned by defendant: "Comment by the Prosecutor Upon Appellant's Failure to Testify . . . ." This irregularity (the nature and extent of which we will explain) is compounded by an erroneous instruction.

The district attorney alluded to the circumstance of defendant not testifying in two respects, both connected with the presence or absence of motive: (1) his failure to support the absence of motive; (2) his concealment of a motive.[5] Lack of motive, of course, was a strong factor in

---

[5]The two aspects are, at one point in the record, in a way commingled. But the excerpts are distinguishable and deserving of segregation and individual treatment. Our quotations are handled in this manner. The portion of the record with the commingling reads as follows: "We don't know from all the evidence you have heard

the medical opinions that defendant was in a psychomotor epileptic seizure.[6]

We note, as to the first aspect, that the district attorney in his opening argument, after stating, in effect, that from the methodology employed by defendant (a killing "carried out as an execution") it was to be inferred that he killed Kramos with malice and premeditation and that all the elements of first degree murder had thus been proved, and after stating that, although it was not an element of the crime, motive could be used to help prove guilt (in this instance be supportive of defendant's capacity for specific intent), said in part: "[N]o evidence has been brought before you that you can say, 'There's no reason for killing him.' We don't know. The defense has not chosen to tell us or indicate a reason."

In light of a prominent feature in the case, the most obvious connotation of the asserted failure to bring evidence or "to tell" is that such could have been done by defendant himself, making the remark come close to a comment on defendant's not testifying.

The reference likely was to the circumstance that defendant did not tell the jury what he had told the doctors—that he had blacked out, that, in effect, he had no motive, and that, to Dr. Marcus, he had had alcohol the night before and the morning of the event.[7] It is significant in light

---

here why Mr. Williams killed Anthony Kramos. There is no evidence that has been produced to you as to why. . . . ¶ [N]o evidence has been introduced in this court that indicates that he had any reason for killing him. In other words, no evidence has been brought before you, that you can say, 'There's no reason for killing him.' We don't know. The defense has not chosen to tell us or indicate a reason."

[6]See footnote 9, *infra.*

[7]The oblique reference to defendant's failure to testify on the subject of his alleged consumption of alcohol is not nearly as serious as on the subject of his asserted blackout. This is because there was much before the jury to indicate that defendant's statement to Dr. Marcus was fabricated. It was made after defendant had had the opportunity to learn about the results of the EEG produced under alcoholic stimulants and after defendant had told one doctor that he never indulged in "morning-after" "pickmeups." Also defendant not doing so suggests that he was not able to produce better evidence of his having ingested alcohol such as, for example only, the testimony of a bartender to show the evening consumption and of a partially consumed bottle to show that of the morning after.

In one sense defendant's statement to Dr. Marcus concerning his voluntary ingestion of alcohol could have been considered an admission against interest. This would be to the extent that such ingestion, even though what it did was to intensify brain abnormality rather than by itself cause intoxication which culminated in unconsciousness, might have meant that if the jurors had found that defendant was in a psychomotor epileptic seizure, he could not have been excused from all culpability but would have been guilty of involuntary manslaughter. (*People* v. *Graham,* 71 Cal.2d 303, 316 [78 Cal.Rptr. 217, 455 P.2d 153]; cf. *People* v. *Alexander,* 182 Cal.App.2d

of the fact that the trial court, during the taking of evidence, had explained that the accounts of his (defendant's) personal experience which the psychiatrists testified had been given to them by defendant were not received in evidence for their truth but for the limited purpose of demonstrating upon what their opinions were based, and of the fact that the district attorney, in his argument, stressed that point and advised the jury that the trial court would formally instruct them to this effect, which it did. Thus, the district attorney's claim that defendant had not produced evidence showing lack of motive and his stress on the point that what defendant told the doctors could not be used for the truth of it subtly asked the jurors to infer from the fact that defendant had not testified on these matters that they were not true, any inference from other circumstances in the case notwithstanding. So persuading the jurors would have had the combined effect of showing consciousness of guilt and removing the foundation for the opinions of defendant's psychiatrists.[8]

As to the second aspect of the district attorney's comments, we note that in his opening argument he stated: "We don't know from all the evidence you have heard here why [defendant] killed . . . Kramos. There is no evidence that has been produced to you as to the why . . . . ¶ [N]o evidence has been introduced in this court that indicates that [defendant]

---

281, 291-292 [6 Cal.Rptr. 153].) Perhaps the utilization of this concept was precluded because there was no direct or circumstantial evidence that defendant knew before the date of the homicide that he had a brain abnormality which alcohol would aggravate. Of course, the court's limiting instruction left no leeway for the use of such an evidential rule.

[8]Whether actually intended or not, the following easily would have been conceivable by the jurors as an innuendo from the remark: You should infer from the fact that defendant did not take the stand in the trial and tell you what he had told the doctors (when not under oath) that what he told them was not true and that the incidence of these circumstances is a demonstration of consciousness of guilt and an admission of mental capacity which discredits such other evidence (of a circumstantial nature) as there is supportive of the truth of the statements defendant made to the psychiatrists.

Evidence supportive of defendant having blacked out and of lack of motive was: such circumstances attendant to the event itself as the location (well occupied clinic on busy street), the time of day (broad daylight), the conspicuous method of operation and the deliberateness of movement; evidence supportive of consumption of alcohol was merely the testimony of defendant's girl friend that he drank and at times had odd reactions from doing so.

Defendant urges that a limited hearsay exception should be recognized where a doctor testifies he believes the defendant's extrajudicial statement and the fact finder believes the doctor. The rationale would be, we conceive, that unless this were done the constitutional right of a defendant not to be a witness against himself would be emasculated because of the pressure on such defendant to give the fact finder support for the bases of the medical opinions, especially when he could not marshal any other buttressing evidence. However, we do not feel that the existing rule should be altered. There would be too much danger of fabrication and abuse. That particular pressure must remain one of the exigencies of a lawsuit such as this.

had any reason for killing him." Then in his closing argument, after saying that defense counsel had made the observation that the prosecution had not been able to come up with a motive (an argument probably made because of the speculative character of the asserted vehicular encounter, to be later discussed) the district attorney said: "We can't bring back . . . Kramos and ask . . . Kramos if he knows why he was killed. It is possible *there is one person and only one person that knows why he was killed, and I suggest to you that is . . . Williams [defendant]*." (Italics added.)

Near the end of his closing argument, after saying that motive is of benefit in some cases, the deputy district attorney stated: "It's of no benefit in this particular case because *no one* has chosen to tell us what the motive was." (Italics added.)

Although the deputy district attorney said in the last excerpt that "no one" has chosen to tell what the motive was, it is clear that he was speaking of defendant himself, particularly in light of his remark in the prior excerpt that there was only one person who knew why Kramos was killed and that was defendant (even though it was introduced with the words "It is possible").

Under one obvious construction of these statements the jurors were being asked by the deputy district attorney to believe that in fact there was a motive for the crime but that defendant had "chosen" not to reveal it, and to reach this belief from the circumstance that defendant had not testified; that defendant wished to conceal the motive and did not take the stand for fear that he would inadvertently reveal it or would have a compulsion to disclose it under aggressive cross-examination. That the jurors would come to this belief from that circumstance was made more likely by the deputy district attorney's reference to the concept of some type of altercation following an automobile encounter between defendant and the deceased (discussed in more detail *infra*) as providing the motive for defendant's acts. Lack of motive, of course, was one of the factors stressed by the psychiatrists called by defendant in expressing the opinion that defendant could have been in an unconscious state.[9] Implying the existence

[9]The following excerpts indicate how much significance each of the psychiatrists attached to the absence of motive. First is Dr. Abe: "Q. [District attorney, cross-examining]: Would it make any difference if he was angry at Mr. Kramos? ¶ A. It could, yes. ¶ Q. And if there was a reason why he killed Mr. Kramos, would that change your opinion? ¶ A. If there was a reason, it may, yes. ¶ Q. But you don't know if there is a reason? ¶ A. To my present knowledge, this is one of the bases for my medical opinion is that there's no reason that I know of why he would do so."

Next is Dr. Thompson: "Q. [District attorney, cross-examining]: Doctor, if you

of some concealed motive and so a consciousness of guilt from defendant's exercise of his constitutional right not to testify is the type of evil which *Griffin* v. *California*, 380 U.S. 609, 612 [14 L.Ed.2d 106, 108, 85 S.Ct. 1229], sought to eliminate. (See also *People* v. *Crawford*, 253 Cal.App.2d 524, 534-536 [61 Cal.Rptr. 472] (cert. den. 390 U.S. 1006 [20 L.Ed.2d 108, 88 S.Ct. 1254]) [comment on failure to disclose alibi]; *United States* v. *Wertz*, 447 F.2d 451, 452 [prosecution comment was that the defendant should have owned up to the crime as his codefendant had].)

---

were told there was a reason for the killing, would that in any way affect your opinion? ¶ A. Yes."

That the factor of lack of motive was important to Dr. Thompson is further indicated from the circumstance that defense counsel posed to him a hypothetical question, the substance of which carried the lack of motive concept to which the doctor responded that such a set of circumstances could result from psychomotor epilepsy. Particularly would this be apparent from the following excerpt of the redirect examination of Dr. Thompson: "Q. [by defense counsel]: Now, one variable, Doctor, which I neglected to include in my hypothetical and would like to add . . . [-] [i]f it could not be shown that there was any connection whatever between the victim and the assailant . . . and no conceivable motive . . . , would this in any way tend to implement your opinion . . . ? [Witness allowed to answer over an objection.] THE WITNESS: Yes, it would. It would tend to implement my opinion and to support a greater likelihood of a diagnosis of a psychomotor attack at that particular time."

Next is Dr. Marcus. In cross-examining him, the district attorney put this question: "Q. [H]ow did you arrive at the opinion that . . . defendant had suffered a psychomotor epileptic seizure at the time the crime was committed? ¶ A. The main source of the opinion was the lack of motive and the rationale for the crime. ¶ The other consideration was the way in which it was committed." The district attorney reminded Dr. Marcus that he had responded in the affirmative to a question by defense counsel as to whether a motiveless crime was some indication of convulsive behavior and then asked, "Well, what did you mean when you answered that question yes? ¶ A. I meant that there's a—that seizures of the psychomotor type, if combined with some crime, are usually connected if the crime can be shown to be quite motiveless and random. ¶ On the other hand, if that's not the case, then it's a very difficult task to establish causal relationship between the crime and the epilepsy." In redirect questioning, defense counsel posed the assumption for Dr. Marcus that the crime was not only without motive, but there appeared to be no connection between the deceased and the assailant with the crime being committed in daylight adjacent to a busy street in the presence of many witnesses, and then asked if these "variables" would tend to increase or decrease his opinion as to the fact that the person was "engaged in a physchomotor epileptic attack at the time." The doctor responded, "It increases my opinion."

Finally, there is Dr. Walters. Even he had something to say on the matter of motive. The following colloquy took place between defense counsel and him: "Q. [W]ould you not be concerned that there was no motivation, particularly as you are concerned with mental capacity? ¶ A. Problems in motivation are for other people to discover it. ¶ Q. Insofar as deliberation and premeditation in planning a murder, is it not usual in your experience that there is some sort of motivation? [An objection was overruled.] ¶ THE WITNESS: I think there is a motive. Yes, people's behavior is motivated. ¶ Q. So if there is an absence of motive that you are able to discern, would not that be of some materiality insofar as your appraisal of the facts is concerned, Doctor? ¶ A. Yes."

The district attorney certainly came to the brink of impropriety. His conduct must be viewed seriously in light of the other errors. The Attorney General argues that all the district attorney meant by his remarks was that defendant had a motive but chose not to tell about it to the psychiatrists; that a prosecutor's pointing to a defendant's failure to reveal to an examining doctor a certain circumstance of foundational import for his opinion is different than pointing to the fact that a defendant's not testifying is indicative of an intent to conceal a motive or of the nonoccurrence of the questioned circumstance. The answer in the instant case is that the district attorney's comments were susceptible to dual construction, one of which was impermissibly detrimental to defendant and that this required an accurate judicial explanation of the rule protecting a defendant from being compelled to be a witness against himself.

Failure of defendant's attorney to object to these prosecution comments should not be treated as a waiver. She might have reasoned that the consequent emphasis of the feature would do more damage than a secured judicial admonition would assist.

■ The possible prejudice from these prosecution comments was compounded by a phrase in the cautionary instruction which the trial court had already determined to and did give to the jury at the end of argument, of the connotation of which both the trial court and defense counsel apparently were unaware. After giving the instruction which contains the customary warning that the jury "must not draw any inference of guilt from the fact that he does not testify" (No. 2.60 of California Jury Instructions, Criminal (3d rev. ed. 1970)—hereinafter, CALJIC), the trial court gave an instruction (CALJIC No. 2.61) which included these words: "no lack of testimony on defendant's part will supply a failure of proof by the People so as to support *by itself* a finding against him on any such element." (Italics added.) By this, the jurors were told, in effect, that they could not infer from the circumstance that defendant did not testify that a certain thing was true and use this alone as the support for a finding on their part that an element of the crime or an indication of guilt had been proved, but that they could use such inference along with other evidence to support such a finding. This demeaned the force of the preceding instruction which had stated that they must not draw any inference of guilt. For despite that instruction they are being told that they *can* draw an inference from defendant's silence if they can use it along with some other evidence. This was error.[10] (*People v. Townsend*, 20 Cal.App.3d 919, 923-925 [98 Cal.Rptr. 8].)

---

[10]The written instruction in the record which is a replica of CALJIC No. 2.61 has the box next to the word "modified" marked on it. However, no modification appears.

Defendant's lack of testimony did not stand by itself. Hence, under the instruction the jury could have considered defendant's failure to testify in conjunction with the hearsay evidence supportive of motive and in conjunction with the circumstantial evidence suggestive of consciousness and capacity and of the falsity of the blackout and alcohol statements made to the doctors.[11]

The Attorney General urges that the concept that CALJIC No. 2.61 "does not refer to a possibility that an element of a crime can be determined by the conjunction of the Defendant's lack of testimony and other evidence is shown by CALJIC 2.60 which states that no inference of guilt can be made if the Defendant does not take the stand." However, logically this is not what was said. CALJIC No. 2.60 does not cure the error in logic of CALJIC No. 2.61 because there is no instruction which tells the jury that in the case of an inconsistency in instructions they should consider CALJIC No. 2.60 as superseding any other instruction; also, CALJIC No. 2.61 was read after CALJIC No. 2.60 and so should be considered as qualifying it.

The conduct of counsel for the prosecution just examined, although not blatant, particularly as abetted by the erroneous instruction, could have been subtly effective.

 Defendant urges that one other action of the district attorney, also tied into the subject of motive, constituted misconduct. However, we feel that, rather, an absence of positive reaction to it by defense counsel amounted to an inadequacy of legal representation in a crucial stage of the trial. This had to do with the injection and use by the district attorney in

---

Perhaps the trial court had intended to eliminate the words "by itself" but did not do so. What the trial court read to the jury was not included in the reporter's transcript. On this state of the record, we must assume that the trial court read it as it appears, and, in any event, it went in to the jury deliberation room for its use in the form we have.

[11]Just as an example as to how the errant words in the instruction under discussion may have played a part in the jury's ultimate action, we pose this as a reasonable likelihood: that some of the jurors were having difficulty in evaluating the views of the psychiatrists on the issue of whether defendant was or was not unconscious, the resolution of which issue might determine as well for them the elements of premeditation and malice; that they felt inclined toward the view of Dr. Walters but had a reasonable doubt because of the apparent absence of motive, only the "speculation" of an automobile encounter was before them. Now they focus on the questioned instruction and reason that they could draw from defendant's failure to testify the inference, intimated by the deputy district attorney's remarks, that defendant had a motive which was ulterior because he had chosen not to reveal it, and now they combine this with the seemingly purposeful nature of defendant's conduct about which they had heard or with the automobile encounter "speculation," or both, and decide that defendant had been conscious and had deliberated and premeditated and harbored malice.

the trial of an alleged pre-homicide contact between defendant and the deceased in their automobiles.

The concept of a traffic encounter between defendant and the deceased in automobiles as giving rise to a possible motive was first injected into the trial by the district attorney during the course of his direct examination of Mykietyn, the deceased's co-optician, who was present in the clinic along with the deceased before and at the time of the incident.[12]

After having Mykietyn give the connecting information about himself and having him identify the deceased from photographs, the district attorney proceeded as follows: "Q. On January 5, 1970, did you talk to [deceased] on that day? ¶ A. We spoke a little bit. ¶ Q. About what time was that? ¶ A. It must have been after 10:00. ¶ Q. *Do you recall what the conversation was about?* Without telling me what the conversation was about . . . just do you recall the conversation? ¶ A. Yes. It was about automobiles, his automobile. . . . ¶ Q. *You had a conversation with him in regard to an automobile, is that correct?* ¶ A. Yes." (Italics added.) The district attorney then went on to have the witness describe what he had observed of the shooting and its aftermath.

The next reference to the subject was accomplished during cross-examination of Dr. Abe. Pertinent excerpts are as follows: "Q. [by district attorney]: Would it make any difference if [defendant] was angry at Mr. Kramos? ¶ A. It could, yes. ¶ Q. And if there was a reason why he killed Mr. Kramos, would that change your opinion? ¶ A. If there was a reason, it may, yes. . . . ¶ Q. Let me give you an additional set of facts, that Mr. Kramos arrived at work at the eye clinic at approximately 10:15 a.m. Now, it's possible, based on those facts I gave you, that there could have been an encounter on the highway in vehicles; is that correct?"

The trial court at this point intervened and recommended the putting of the question on a more hypothetical basis. The district attorney then continued as follows: "Q. Assume that Mr. Kramos arrived by vehicle at the eye clinic at 4401 [Vermont] and also assume that Mr.—well, strike that. ¶ I'll withdraw that, your Honor."[13]

There was no objection by defense counsel to either of the emphasized questions in the first quotation; nor was there ever a motion to strike the witness' response to the second part of the first question to the effect that

---

[12]Mykietyn advised that at one time he was a brother-in-law of the deceased. (He apparently meant that there had been a divorce rather than that death had ended the relationship.)

[13]It would appear that the district attorney at this point decided that advantage could be adequately taken of the hearsay material on motive in argument to the jury.

the conversation was about automobiles or the affirmative answer to the last question. It is possible that defense counsel's impression just at that time was that the questions and answers were innocuous, although an alert and perspicacious attorney probably would have appreciated the future use which could be made of this fragment of evidence by the prosecution. In any event, the significance of it certainly should have become clear when the concept was again alluded to by the district attorney in cross-examining Dr. Abe, and certainly at the point when the district attorney made reference to the subject in the course of his arguments to the jury. Neither occasion really would have been too late for defense counsel to have acted.

Mykietyn's choice of answering the first and not the revised question of counsel concerning the conversation he had had with the deceased and his announcement that he recalled the conversation and that it was about automobiles, Kramos' automobile, constituted a partial recounting of the substance of the conversation. The framing of the first question by the district attorney, the nature of the witness' response, and the pursuit by the district attorney of the response to emphasize it by repetition, suggest a willingness on the part of the prosecution to get that much of the conversation before the jury and an expectation that the jury would fill in, by the process of deduction, enough of the insinuated balance so as to make part of the evidence they were willing to consider a vehicular encounter between defendant and the deceased leading to an altercation between them. The partial substance of this evidential fragment was direct hearsay and the balance what might be termed "circumstantial hearsay." Whether the entire substance came from the testimony of Mykietyn or partly from him and partly from employment of the process of deduction by the jury, it would be hearsay, and the question therefore presents itself whether the recounting of the deceased's statement was admissible under some exception to the hearsay rule. It was not. It was neither a spontaneous nor a dying declaration nor a verbal act. (*People* v. *Keelin,* 136 Cal.App.2d 860, 865-874 [289 P.2d 520, 56 A.L.R.2d 355], questioned in *People* v. *Cruz,* 264 Cal. App.2d 350, 360 [70 Cal.Rptr. 603], on a point inapplicable here, however *Cruz* also defines spontaneous declarations and verbal acts.) Defense counsel certainly should have sought to have had it stricken as soon as the district attorney's intended use of it became apparent in his interrogation of Dr. Abe. One right and never to be forsaken duty of defense counsel in the instant case in the critical area of motive was to keep away from the attention of the jury any matter which the law deemed unsatisfactory as proof.

In argument to the jury, the district attorney turned to the subject in the following manner: "You can speculate, and to me it is [a] speculation based on evidence that we do have. We do have evidence that . . . Kramos arrived at 10:15 at work and we know that . . . defendant left

work sometime between 9:10 and 10:00 o'clock . . . and . . . drove down to the area where the crime occurred. . . . We can speculate that there could have been some sort of altercation between . . . Kramos and [defendant]. We can speculate that as a result of that altercation [defendant] got his rifle and went there to kill him."

There was no direct reference to Mykietyn's testimony, but the tie-in was obvious. We note that at one point in its deliberations the jury sent a message to the trial court requesting that the testimony of Mykietyn be read to them.[14]

The district attorney practically was asking the jurors to use what even he termed speculation as evidence.[15] The trial court should have intervened right then to warn against any such occurrence in the jury room. "Mere speculation cannot be allowed to do duty for probative facts." (*Estate of Beebee,* 118 Cal.App.2d 851, 858 [258 P.2d 1101].) The trial court's later formal instruction to the effect that the jury should not be governed by mere conjecture, perhaps helped to alleviate, but did not cure, this blunder. Moreover, defense counsel did not intervene as she might have to ask the trial court for a session out of the presence of the jury so that she could move to strike the hearsay testimony inferential of a vehicular encounter and altercation so as to lay a basis for asking to have the remarks of the prosecutor stricken.

In his concluding argument, the district attorney continued to bear upon the subject. After quoting from the instruction which the trial court had indicated it was going to give on motive,[16] he argued as follows: "The defense has not chosen to indicate to us any motive. That is their prerogative. . . . I believe, as I mentioned in my opening statement, the fact that there could be many reasons, which I stated at that time [these examples had included of course the posed automobile encounter[17]] . . . . I said that

---

[14]The request was also for the testimony of Dr. Thompson. As a result of delay and the exchange of other messages only the testimony of Dr. Thompson was read to the jurors. In light of the fact that the request coupled the testimony of Mykietyn and Dr. Thompson, it is not at all unlikely that the jury's interest was in the motive aspect of the doctor's testimony and the above quoted excerpt from Mykietyn's testimony.

[15]Of course, it would have been improper for the district attorney to argue what, he, himself, only considered in the category of pure speculation.

[16]"Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence. You will therefore give its presence or absence, as the case may be, the weight to which you find it to be entitled." (CALJIC NO. 2.51.)

[17]The district attorney had also speculated as to an argument over a woman or money.

would be mere speculation, but I didn't mean to intimate that any one of those reasons was not the motive."

In light of the fact that there was no objection or motion to strike, it was not improper for the district attorney to use the hearsay in formulating a hypothetical question or in arguing to the jury unless it has to be said that, as a matter of law, whether an objection was registered or not, the mental passage from a mere happening involving automobiles, including the deceased's, to one involving defendant's as well and to an altercation (apparently verbal) was too much a conjecture to be accorded the judicial position of a legitimate inference. We do not say this as a matter of law, and we note that the district attorney was giving it practical, if not verbal, inference treatment without objection from defendant. ▆ Hearsay not objected to, of course, takes on the attributes of competent proof. It is usable upon the question of the sufficiency of the evidence to support a finding (*Berry* v. *Chrome Crankshaft Co.*, 159 Cal.App.2d 549, 552 [324 P.2d 70]), and it is not necessarily misconduct under our adversary systems for counsel to open the way for the receipt of hearsay.[18] On the other hand, if it had been a deliberate plan of the prosecution to get a nonresponsive answer embodying the hearsay, as if it were an inadvertent spontaneous utterance of the witness, then, of course, there would have been prosecution misconduct. ▆ But it is by no means clear that Mykietyn's utterance was not genuinely inadvertent. So we classify this aspect of the case as a breakdown in legal representation which substantially reduced the strength of defendant's claim of totally diminished capacity. This can be equated with the frequently reiterated concept of "withdrawing a crucial defense." (*People* v. *Ibarra*, 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].)

▆ Defendant contends that the trial court confused the jury with its instructional treatment of the doctrines of diminished capacity for intent and unconsciousness of actions as distinct and unrelated defenses.[19] The problem goes deeper than that. Our consideration of the contention led us

---

[18]In any event, it either was prosecution misconduct to inject this hearsay and pursue it or a serious lapse in defense attorney competence to permit it.

[19]The district attorney capitalized on this segregation of concepts, arguing to the jury: "[I]f you consider the testimony of the psychiatrists, specifically Dr. Abe and Dr. Marcus, they don't actually tell you there is diminished capacity, they don't testify about diminished capacity. They testify about unconsciousness. They didn't testify that this man's capacity was substantially reduced. They said that this man was unconscious. . . ." Obviously this was an effort to draw the attention of the jurors away from the concept that diminished capacity could result from the type of unconsciousness experienced in a psychomotor epileptic seizure. A ploy prompted no doubt by the thought that the jury might not embrace the defense of unawareness of act, even though instructed upon it, but would accept as a defense the idea of an absence of the prerequisite intents brought on by a psychomotor epileptic seizure.

to another instruction which points up the greater issue.[20] The instruction is not from CALJIC. It was prepared by the prosecution and based on Penal Code section 1026. It reads in pertinent part as follows: "The defendant . . . has during the course of this trial entered a plea of not guilty and not guilty by reason of insanity.

"When such a plea is entered, the law requires that he shall first be tried on the question of his guilt or innocence of the charge contained in the Information.

*"In such a trial, as we are presently having [defendant] shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed.*

"The question of whether . . . defendant was sane or insane at the time the offense is alleged to have been committed may be determined in a different proceeding." (Italics added.) In a way related to this instruction is the first paragraph of CALJIC No. 3.34, which the trial court gave: "The intent with which an act is done is shown by the circumstances attending the act, the manner in which it is done, the means used, and the *soundness of mind* and discretion of the person committing the act." (Italics added.) It is said that, even without the second paragraph in this instruction,[21] the reference to soundness of mind is an affirmation by the trial court to be heeded by the jury that the defendant is of sound mind. (*People* v. *Henderson*, 60 Cal.2d 482, 492-493 [35 Cal.Rptr. 77, 386 P.2d 677].) Considering the common approach of these two instructions, the jury could have equated soundness of mind with sanity. Even a superior court judge has done this, although the terms really "are not synonymous." (*People* v. *Baker*, 42 Cal. 2d 550, 566, 568 [268 P.2d 705] [the Supreme Court points to the judge's miscue and defines both terms].) This is significant because, within the context of the evidence in the instant case, unsoundness of mind, in turn, readily could have been equated with abnormality of mind or brain and so with the unconsciousness or totally diminished capacity which it allegedly

---

[20]Incidentally, the instruction, certainly by inadvertence, is not included in the clerk's transcript. A page thereof, 27, is missing. However, it is in the superior court file, which we examined (Rules of Court, rule 12a), numbered as if to be included in the clerk's transcript, and it is in the reporter's transcript as read by the trial court when it was in conference with counsel on instructions.

[21]The second paragraph, which was not given because the trial court felt it was covered by the prior instruction, reads as follows: "For the purpose of the case on trial, you must assume that the defendant was of sound mind at the time of his alleged conduct which, it is charged, constituted the crime described in the information."

produced. The psychiatrists spoke of defendant having an abnormal brain, one even of his being insane, of his mind being temporarily gone.[22]

With the instruction on manifestations of intent, CALJIC No. 3.34, the editors have included this caveat: "Do not give second paragraph [assumption of soundness of mind] in a specific intent crime if there is evidence of diminished capacity."

It is to be noted that the trial court did not define insanity so as to permit

[22]Some excerpts from the record which are representative of the indicated viewpoint are as follows:

The trial court allowed Dr. Abe to express his opinion, elicited by defense counsel, as to defendant's sanity or insanity in view of a probable psychomotor attack as it bore upon defendant's ability to form a specific intent. The doctor gave his belief that defendant was insane and incapable of forming the intent.

A short time later Dr. Abe pointed out that his report expressed his feeling of the possibility that defendant could be considered a mentally ill person due to a convulsive disorder.

Shortly thereafter Dr. Abe expressed the opinion that a person having a psychomotor epileptic seizure becomes unconscious in the sense that his mind is temporarily gone.

Somewhat later, referring to the status of defendant's brain, Dr. Abe observed that apparently he had bi-frontal abnormalities and also a right temporal abnormality, and he agreed that the EEG did indicate a definite abnormality of the mind.

Dr. Thompson spoke in a similar vein. There is absolutely no way, he stated, to produce an abnormal electroencephalogram from an entirely normal brain. He also testified that an abnormal EEG indicates something wrong with the brain. He advised that when an electroencephalogram shows a brain abnormality, it is 100 percent accurate. He shortly expanded by explaining that an EEG does not indicate any particular type of mental illness but indicates a certain type of brain abnormality, adding that the only type that would correspond at all with mental illness of some kind is a psychomotor seizure pattern.

Discussing the brain abnormality productive of psychomotor epilepsy, Dr. Thompson asserted that it was an abnormality of either the frontal lobes or the temporal lobes, or both.

Referring again to the correlation of brain abnormality with mental illness, Dr. Thompson stated that mental illness does not produce an abnormality in the electroencephalogram, unless it is due to organic damage or disease. He also added that the abnormalities he had found in the left and right frontal lobe and the right temporal lobe of defendant could occur with a brain tumor and that would be an excellent cause of psychomotor seizure.

Dr. Marcus testified that during a psychomotor epileptic attack, it would be fair to say that the person is unconscious in an electrical sense. That is, his brain electricity is abnormal. He is not unconscious in the lay sense "of laying out cold somewhere." The doctor also confirmed that the EEG showed an abnormality of the right temporal lobe.

Dr. Walters also spoke of abnormality in the frontal leads (abnormal brain waves). Dr. Walters read from his report to the effect that there was a "remote possibility that this defendant may suffer from some form of abnormal brain activity of a seizure variety of epilepsy which may in itself produce an altered state of consciousness. . . ." However, Dr. Walters did express the opinion that defendant's past history and examinations done in the spring and in August of the year of the trial, 1970, would indicate that he would not be considered a mentally ill person.

of any realization by the jury in what way it differed from "totally diminished capacity"[23] or in what way, although they could stem from the same condition, the one should not and the other should be given consideration in the guilt phase. ▓ Legal insanity, of course, means "a . . . deranged condition of the mind which makes a person incapable of . . . understanding the nature and quality of his act, or . . . of . . . understanding that his act was wrong." (CALJIC No. 4.00, citing *People* v. *Wolff*, 61 Cal.2d 795, 800, fn. 1 [40 Cal.Rptr. 271, 394 P.2d 959].) ▓ Under this definition the condition defendant was said to be in if he had been suffering a psychomotor epileptic seizure would have made him legally insane as well as unconscious of his actions and diminished in capacity for the requisite specific intents. The instant case was of the type wherein it would have been provident to try the guilt and sanity issues together[24] as was done by stipulation in *People* v. *Baker, supra,* 42 Cal.2d 550, 565.

The trial court after having given its instruction explaining the two phases of the trial and advising that defendant was to be conclusively presumed sane in the first, then should have defined insanity and clarified the duty and task of the jurors as to their dealings with the concepts of diminished capacity for specific intent and unconsciousness of actions.[25] It is vital that a jury be instructed in clear and unambiguous terms. (*People* v. *Baker, supra,* at p. 570.) Absent such an instruction, the danger of equation of soundness or normality of mind with the sanity, which the jurors were told

---

[23]The trial court did give the definition and to some extent the distinction in its instructions in the sanity phase. (CALJIC Nos. 4.00 and 4.01.)

[24]If the case is to be tried again after remand, trial court and counsel might give serious consideration to doing this.

[25]In this respect it might have helped also if the trial court in the guilt phase had given CALJIC No. 4.01, which, expurgated for ease of review, reads: "Mental . . . abnormality, in whatever form [it] may appear, [is] not necessarily the same as legal insanity. A person may be . . . mentally abnormal and yet not be legally insane. For . . . mental abnormality to be a defense to crime, such condition must make the person incapable of . . . understanding the nature and quality of his act, or make him incapable of . . . understanding that his act was wrong."

Just as an example and without intending the wording to be a model, we suggest that the trial court, after defining insanity for the jurors might have further instructed that they should not let themselves become concerned over the fact that an unconscious state of defendant incident to a psychomotor epileptic seizure, if they found such existed, would mean that defendant was incapable of understanding the nature and quality of his act or of understanding that his act was wrong, or both, as well as mean that defendant was not at all aware of his action or did not have the capacity to premeditate, deliberate or harbor malice. (See *People* v. *Steele,* 237 Cal.App.2d 182, 191 [46 Cal.Rptr. 704], where this court points out that "[t]he result of *Wolff* [*supra*] makes it abundantly clear that the same testimony may be highly relevant on the issue of the essential mental state as well as on the issue of insanity.")

defendant was presumed to have, was present; we cannot be satisfied that such equation was not carried out.

As to this instruction there is no problem of invited error because defense counsel entered a type of objection to the giving of it in the form proposed. At the conference on instructions she sensed the point of possible confusion we have stressed and asked, "Whether there was anything so far as that presumptive construction [*sic*—instruction] was concerned which would lead the jurors into the diminished capacity subject." Defense counsel was asking that some explanation be given by the trial court to the jury to the effect that despite the presumption of legal sanity nonetheless the defense of totally diminished capacity was available to defendant. The trial court advised that it thought that counsel could handle that situation in argument. We do not believe that any such treatment would have been adequate.[26]

■ Another instruction which defendant asserts was confusing to the jury was CALJIC No. 4.30. We agree that it must have been. It reads: "Where a person commits an act without being conscious thereof, such act is not criminal even though, if committed by a person who was conscious, it would be a crime.

"This rule of law applies only to cases of the unconsciousness of persons of sound mind, such as somnambulists or persons suffering from the delirium of fever, epilepsy, a blow on the head or the involuntary taking of drugs or intoxicating liquor, and other cases in which there is no functioning of the conscious mind." The medical testimony was such that it could not have been clear to the jury that the term epilepsy in this instruction embraced psychomotor epilepsy. If they thought it did not, it excluded the application of the rule to defendant; if they thought it did, they encountered a conflict, because the expert testimony was to the effect that psychomotor epileptics had unsound minds. In cases of the instant type the indirect preclusion of the use of the rule to persons of unsound mind should be eliminated. Perhaps to us the point is not too significant because we are possessed of the knowledge, through certain queries which they put to the trial court in the insanity phase, that the jurors did rest their decision in the guilt phase on a finding as between defendant being conscious or unconscious of his acts.[27]

---

[26]We do not know what was attempted because the argument is not part of the record on appeal. Contrast this difficulty with the situation of the trial court defining the concepts of unconscious act and diminished capacity separately and then letting counsel explain how each could derive from the same unconscious state.

[27]A message sent by the jurors to the trial court during their deliberations of the sanity phase stated in part: "Specifically, having decided from the evidence given during the first phase that defendant was conscious, are we now free to consider that he was unconscious?"

The jury sent in a second identical query after having been partially reinstructed following its first query.

However, it is easy for one to say that a defendant was conscious, rather than unconscious, when one is being told by the source of legal knowledge that even if he were unconscious, by reason of the fact that that state derives from unsoundness of mind, the excusatory rule of law would not apply.

 We also feel that, as contended by defendant, in the structure of this particular case, the trial court erred in giving CALJIC No. 4.31. After instructing the jury that the commission of an act without being conscious thereof is not criminal even though its commission by a conscious person would be a crime (part of CALJIC No. 4.30), the trial court gave CALJIC No. 4.31 which reads as follows: "If the evidence establishes beyond a reasonable doubt that at the time of the commission of the alleged offense the defendant acted as if he was conscious, you should find that he was conscious. ¶ However, if the evidence raises a reasonable doubt that he was in fact conscious, you should find that he was then unconscious."

The sense of this instruction is completely incompatible with the view of all the expert witnesses that to an outward observer, even a trained physician, a person in a psychomotor seizure acts quite purposefully and normally; in effect, as if he were conscious.[28] It could have, in fact, probably

---

[28]For example:

*From the interrogation of Dr. Thompson:*

"Q. In your opinion, a person producing that particular type of an electroencephalogram, could that person act normally at all times? A. You say 'could he'? Q. Yes, could he? A. Yes."

"Q. Is it not true, Dr. Thompson, that during the course of any type of seizure of a type that would be present in a psychomotor epileptic condition that the person could seem to be conscious and even purposeful in his activity? . . . THE WITNESS: Yes, that is correct. During a psychomotor attack patients can carry out seemingly motivated behavior which, to a casual observer, or even the experienced observer, appears to be motivated and yet of which the individual is totally unaware."

"Q. . . . though the behavior seems purposeful, the patient is clearly not in what we would call a conscious state, is he? A. No, he is not in a conscious state. In the psychomotor attack the activity carried out is unconscious."

"Q. . . . Doctor, how does a person generally act during a psychomotor epileptic attack? A. The person usually carries on what is called automatic behavior. It is an epileptic automatism. He carries out a behavior which may seem motivated and it may seem integrated and it may seem reasonable at times, but the behavior is essentially an automatic act. . . . Q. When you say 'automatic behavior' what type of behavior do you consider to be automatic behavior? A. Well, it's automatic in the sense that it is not voluntarily motivated by the brain. It is automatic in the sense that he is unconscious, that the patient is unconscious of what he is doing. He may continue to walk. He may drive an automobile. He may do anything. Q. He can drive an automobile? A. Yes. Q. How would he drive the automobile? A. Just drive it. Q. Could he do complicated things with the automobile? A. Yes. Q. Was that what you would expect to find after someone is experiencing a physchomotor epileptic attack? A. Well, that's what happens. Q. Doctor, is this frequent or infrequent? A. I don't know how to answer that. I don't believe that people have made studies on psychomotor epileptic attacks to determine that. Q. Do you think he could do complicated maneuvers with an automobile during an attack of psychomotor epilepsy?

appeared to the jurors that the trial court was instructing them that, despite the opinions of the medical experts, unanimous under an assumption of the

A. Yes. Q. Would you expect to find complicated courses of conduct? A. Yes. Q. Would you expect to find it all the time? A. Not all the time. At times the acts carried on are fairly simple, but some are complicated. Q. Are the majority simple or complicated? A. I don't know. As I say, I don't know anyone who has compiled a series of psychomotor epilepsy actions in order to determine that. It can be either."

"I had one man who had an attack and went over to my secretary and paid his bill for the visit, and then went back and sat down, and then later I saw him. I observed this through my open door in the waiting room. After his visit with me he went back and again tried to pay the bill to the secretary. He had an attack, a psychomotor seizure, and paid his bill during that. Q. Actually engaged in this transaction during the course of the attack? A. Yes. He had no memory of it."

"This state [psychomotor] may last from a minute to sometimes hours. Generally in this state, a person who observes this individual may think that the person knows what he is doing because there seems to be some purpose in his behavior or by the person himself, but the person is quite unaware of what he is doing."

"Well, I think in a psychomotor state, as I indicated before, a person can seemingly conduct a purposeful kind of act such as getting in a car and so forth. That doesn't eliminate the symptomatology of psychomotor epilepsy."

"As I indicated to you before, in a psychomotor attack the actions seemingly can be purposeful in many respects, so I don't see any reason why I should change my mind based upon that factor alone."

"A . . . The unconscious state is the situation where the mental condition is not present, is possibly disoriented. The person is able to walk around and do things, even what seems to be purposeful acts."

"Q. Is any part of the mind functioning? A. Well, apparently there is some part of his mind that is functioning because he is walking around, but it is certainly not of a conscious, deliberate, premeditated volitional kind of basis. Q. Can you drive a car in this state? A. Yes, you can. Q. Can you eat? A. I have repeated over and over again, the person can carry out purposeful acts, but he is not aware of it. He may go through automatic behavior kind of things, if this will help. People in this state may just carry out the same type of patterns that they did before. It's possible."

*From the interrogation of Dr. Marcus:*

"A. Now, during a psychomotor epileptic attack, is it possible for a person to engage in what might appear to be purposeful behavior? A. Yes. That's one of the characteristics of a psychomotor attack."

"Q. Would he be capable of premeditating and deliberating insofar as his acts are concerned? A. Not in the midst of a seizure. Q. Even though to an outsider his actions might appear to be purposeful? A. That's correct."

"A. Well, any part of the mind may function. The only part that reasonably doesn't function is the conscious control. Now, there are others—there are sometimes other parts will malfunction, for example, a person may smack his lips or sit there and grin and laugh, so there is obviously some part of the brain that is malfunctioning. It can vary with the type of psychomotor epilepsy. Q. Well, what type of psychomotor epileptic seizure, in your opinion, did Mr. Williams suffer? A. Well, his type involved physical activity in the sense of moving and doing things."

However, at another point in the testimony, Dr. Marcus said: "Q. And generally in a psychomotor epileptic seizure you do not expect to find complicated behavior? A. That is correct."

*From the interrogation of Dr. Walters:*

" 'Usually, such seizures are of short duration, and are manifested by brief periods of unconsciousness or automatic behavior unassociated with a convulsion. . . .' "

"The latest type of epilepsy that has been discovered is the so-called psychomotor

existence of a psychomotor seizure (it being only as to the existence of that premise that their views differed), the law directed that they find that defendant was conscious by reason of his mutually conceded conscious-like acts. CALJIC No. 4.31 requires the jury, as a rule of law, to find a fact and not just give consideration to a rebuttable presumption.

The Attorney General urges that "[t]o not allow the prosecutor to argue that the person who acts conscious is presumed to be conscious would be to emasculate the prosecution's ability to rebut the defense of [unconscious act]." In the context of this case he has to be speaking of a disputable presumption. However, CALJIC No. 4.31 requires the finding of a fact. If a presumption is involved, it is a conclusive one. Unless the trial court had felt that because of the unanimity of medical opinion the disputable presumption was subject to reasonable doubt as a matter of law (in which case it should so advise the jury), it should have composed an instruction that informed the jurors that if they found beyond a reasonable doubt that defendant acted as if he were conscious, a rebuttable presumption arose that he was conscious, as to which defendant had the burden of raising a reasonable doubt. (See *People* v. *Hardy*, 33 Cal.2d 52, 64 [198 P.2d 865], discussing *People* v. *Nihell*, 144 Cal. 200, 202 [77 P. 916].) The Attorney General fails to make the distinction between a disputable presumption and a conclusive finding of fact. As defendant suggests, "[t]his one instruction . . . , by failing to take into consideration the realistic possibility that an individual suffering from [p]sychomotor [e]pilepsy may act conscious but in reality be unconscious, wiped out [his] entire defense."

▌It is true that defense counsel, at the conference, did not object to the trial court's proposal to give CALJIC No. 3.34 (how intent is shown—discussed with prosecution's advertence to defendant's failure to testify) as proposed, requested the giving of CALJIC No. 2.61 (defendant may rely on state of evidence) with the "by itself" phrase in it, and was in agreement that 4.30 (unconscious act) and 4.31 (unconsciousness—burden of proof) should be given. The doctrine of invited error however, does not apply. The instruction applied to such a crucial part of the case that the rule stated in

type, and in this type the individual has a momentary or fleeting type of unconsciousness associated with some muscle activity, but not a convulsion."

"There has been conflict whether or not people can or do commit crimes by some automatic type of behavior."

"Q. During the course of such an attack, can a person actually engage in what appears to be a purposeful behavior, such as driving a car? A. Yes."

*People* v. *Keelin,* 136 Cal.App.2d 860, 873-875 [289 P.2d 520, 56 A.L.R.2d 355], should be applicable. There the defendant, as well as the People, asked for an instruction giving the jury the right to pass on whether a recounted statement of the deceased was a dying declaration, after the trial court had already ruled in favor of the defendant that the declaration had not been so qualified. The reviewing court stated (at pp. 874-875) as follows: "But, as we have said, both the prosecution and the defense requested the court to give this instruction and, therefore, it is apparent that the error, so far as the defense is concerned, is open to the charge that it was invited error of which they cannot complain. Nevertheless, error is nonetheless error and is no less operative on deliberations of the jury because the erroneous instruction may have been requested by counsel for the defense. After all, it is the life and liberty of the defendant in a case such as this that is at hazard in the trial and there is a continuing duty upon the part of the trial court to see to it that the jury are properly instructed upon all matters pertinent to their decision of the cause. It is not every case in which invited error will free the trial from the challenge that such error caused or contributed to a miscarriage of justice." Obviously defense counsel's request and agreement were not tactical ploys, the engagement in which would invoke the doctrine of invited error. (Cf. *People* v. *Graham,* 71 Cal.2d 303, 318-320 [78 Cal.Rptr. 217, 455 P.2d 153]; see also *People* v. *Ruiz,* 11 Cal.App.3d 852, 865 [90 Cal.Rptr. 110] and *People* v. *Ray,* 252 Cal.App.2d 932, 963 [61 Cal.Rptr. 1] [cert. den. 393 U.S. 864 (21 L.Ed.2d 132, 89 S.Ct. 145)].)

Defense counsel was of little assistance in the area of instructions on the defense of unawareness of act and incapacity for intent due to epileptic unconsciousness. However, instructing on this topic became, nonetheless, a judicial responsibility. Although a particular defense was involved, it was basic and fundamental. It was the only real issue in the case from the standpoint of either side.

 Some of the errors reviewed are of constitutional dimension. Although they are not of the type calling for automatic reversal, we are not satisfied beyond a reasonable doubt that the totality of error we have analyzed did not contribute to the guilty verdict, was not harmless error. (*Harrington* v. *California,* 395 U.S. 250, 255 [23 L.Ed.2d 284, 288, 89 S.Ct. 1726]; *Fontaine* v. *California,* 390 U.S. 593, 596 [20 L.Ed.2d 154, 157, 88 S.Ct. 1229]; *Chapman* v. *California,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *Fahy* v. *Connecticut,* 375 U.S. 85, 86-87 [11 L.Ed.2d 171, 172-174, 84 S.Ct. 229]; Cameron and Osborn II, *When*

*Harmless Error Isn't Harmless,* 1 Law & The Social Order, Ariz. State U. L. J. 23.)

The judgment is reversed.

Stephens, Acting P. J., and Aiso, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied February 10, 1972.